<pre>
 1            UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
 2              SOUTHERN DIVISION LONDON

 3
   UNITED STATES OF AMERICA,
 4
          PLAINTIFF,
 5
                              Criminal No. 6:16-MJ-6041
 6  VS.                       At London, Kentucky
                              June 28, 2016
 7                            4:43:31 p.m.

 8  MARK SAWAF,

 9          DEFENDANT.

10

11   TRANSCRIPT OF PRELIMINARY HEARING/DETENTION HEARING
        BEFORE U.S. MAGISTRATE JUDGE HANLY A. INGRAM
12  *Tape #KYED-LON_6-16-mj-6041-1-HAI_20160628_152920 and*
    *KYED-LON_6-16-MJ-6041-1-HAI-PART TWO_20160628_164330*

13

14

15   APPEARANCES:

16
    For the Plaintiff:    Hon. Andrew H. Trimble
17                        Assistant United States Attorney
                          601 Meyers Baker Road
18                        Suite 200
                          London, Kentucky  40741
19                        (606) 330-4838

20
    For the Defendant:    Hon. Travis Alan Rossman
21                        Rossman Law, PLLC
                          220 Court Square
22                        P. O. Box 209
                          Barbourville, Kentucky  40906
23                        (606) 546-2242

24
         Proceedings recorded by digital stenography,
25    transcript produced by computer.
</pre>

1

INDEX

2
Colloquy                                          3-12

3
Government's Proof

4
Direct Examination of TODD EDWARD TREMAINE
5        By:  Mr. Trimble                        13-56

6 Cross-examination
        By:  Mr. Rossman                        56-70
7
Redirect Examination
8        By:  Mr. Trimble                        71-72

9 Examination
        By:  The Court                          72-73
10
Recross-examination
11        By:  Mr. Rossman                       73-74

12
Defendant's Proof

13
Direct Examination of JOHN NAMIR SAWAF
        By:  Mr. Rossman                        77-82
14
Cross-examination
15        By:  Mr. Trimble                       82-84

16 Redirect Examination
        By:  Mr. Rossman                        84-85
17
Examination
18        By:  The Court                            85

19 Direct Examination of NANCY BYRD PENN
        By:  Mr. Rossman                        88-92
20
Cross-examination
21        By:  Mr. Trimble                       92-97

22 Examination
        By:  The Court                          97-103
23
Argument                                      105-124
24
Transcriber's Certificate                        124

25

```
1            [IN OPEN COURT]

2            THE COURT:  Thank you.  Madam Clerk, would

3    you call the 3:30 matter, please.

4            DEPUTY CLERK:  Yes, Your Honor.  It's London

5    Criminal Magistrate Number 16-MJ-6041, United States

6    of America versus Mark Sawaf.

7            THE COURT:  All right.  Thank you.  I see

8    Mr. Trimble and Special Agent Tremaine.  Good

9    afternoon to both of you all.

10            MR. TRIMBLE:  Good afternoon, Your Honor.

11            SPECIAL AGENT TREMAINE:  Hi, Judge.

12            THE COURT:  Thank you.  I recognize

13    Mr. Rossman, of course.  Good afternoon to you.

14            MR. ROSSMAN:  Good afternoon, Your Honor.

15            THE COURT:  I recognize your client Mr. Sawaf

16    as well.  Good afternoon, sir.

17            THE DEFENDANT:  Good afternoon.

18            THE COURT:  Thank you.  All right.  We're

19    here for a preliminary hearing, to be followed, if

20    necessary, by a detention hearing.

21            Mr. Sawaf appeared before me on June 22nd for

22    his initial appearance pursuant to a criminal

23    complaint charging possession of a destructive device

24    in violation of the National Firearms Registration and

25    Transfer Record, and also making of a destructive
```

device in violation of 26 U.S.C., Section 5861.

Was fully advised of his rights with respect to the charges and how they would proceed, including his right to a preliminary hearing.

At the time, Mr. Sawaf had been interviewed by probation, but we did not have a bond report. That since has been prepared and circulated. I've reviewed it, of course, and prepared for the hearing. Let me make sure counsel are ready as well.

Mr. Trimble, let me start with you. You ready for the hearing this afternoon?

MR. TRIMBLE: Yes, Your Honor.

THE COURT: And how do you anticipate presenting your evidence this afternoon? Is there overlap between the government's evidence on the preliminary hearing determination and the detention question?

MR. TRIMBLE: Yes, Your Honor. And Mr. Rossman can speak to this. It's my understanding that the parties have come to an agreement as to waiving the preliminary hearing --

THE COURT: Oh.

MR. TRIMBLE: -- and -- and the United States is -- has agreed to stipulate that the defendant does not present a risk of flight --

1          THE COURT:  Okay.

2          MR. TRIMBLE:  -- in this case.  However, the

3  United States does intend to elicit testimony from

4  Special Agent Tremaine as it relates to -- as it

5  relates to the issue of danger --

6          THE COURT:  Uh-huh.

7          MR. TRIMBLE:  -- and on the -- and on the

8  issue of detention.

9          THE COURT:  Okay.  So you're seeking

10 detention based on danger risks only?

11         MR. TRIMBLE:  That's correct, Your Honor.

12         THE COURT:  Okay.  And as we discussed at the

13 initial appearance, do you concede there is no

14 presumption?

15         MR. TRIMBLE:  Yes, Your Honor.

16         THE COURT:  Okay.  All right.  Mr. Rossman,

17 is that consistent with your understanding of the

18 posture?

19         MR. ROSSMAN:  It is, Your Honor.

20         THE COURT:  Okay.  So he's going to be

21 acknowledging that there's probable cause?

22         MR. ROSSMAN:  Yes, Your Honor.

23         THE COURT:  Okay.  Well, let's get that out

24 of the way by way of stipulation, and then he's going

25 to waive his right to a preliminary hearing?

1          MR. ROSSMAN:  That's correct, Your Honor.

2          THE COURT:  And then we'll take up the

3   detention hearing.

4          How many witnesses, if any, do you anticipate

5   presenting, Mr. Rossman?

6          MR. ROSSMAN:  I anticipate two witnesses,

7   Your Honor.

8          THE COURT:  Okay.  All right.  Fair enough.

9          Mr. Sawaf, given what's just been described

10  to me, would you stand up, please, direct your

11  attention to the clerk so you can be placed under

12  oath.

13          [THE DEFENDANT MARK SAMIR SAWAF WAS SWORN]

14          DEPUTY CLERK:  Thank you.

15          THE COURT:  Okay.  You can be seated.  Thank

16  you.

17          State your full name for me, please.

18          THE DEFENDANT:  Mark Samir Sawaf.

19          THE COURT:  Are you under the influence of

20  alcohol today?

21          THE DEFENDANT:  No, Your Honor.

22          THE COURT:  Are you under the influence of

23  any drug whatsoever?

24          THE DEFENDANT:  No, Your Honor.

25          THE COURT:  Is there any issue with your

physical or mental health that makes it difficult for
you to understand me today?

        THE DEFENDANT:  No, Your Honor.

        THE COURT:  Okay.  Have you discussed your
right to a preliminary hearing with Mr. Rossman?

        MR. ROSSMAN:  Yes, Your Honor.

        THE COURT:  When you discussed that with your
attorney, were you able to understand Mr. Rossman?

        MR. ROSSMAN:  Yes, Your Honor.

        THE COURT:  Have you had a chance to ask him
any question that you have about your right to a
preliminary hearing?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  And did you get answers to your
questions?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  Do you think you're clearheaded
enough today to make good decisions about your rights?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  Any competency concerns,
Mr. Rossman?

        MR. ROSSMAN:  No, Your Honor.

        THE COURT:  All right.  Mr. Trimble, does the
government have any reason to question the defendant's
competency?

1          MR. TRIMBLE:  No, Your Honor.

2          THE COURT:  Okay.  As I explained to you at

3    your initial appearance, Mr. Sawaf, you have the right

4    to a preliminary hearing on these two charges, the

5    charges of possession of a firearm, specifically a

6    destructive device not registered in the National

7    Firearms Registration and Transfer Record, and making

8    of a destructive device in violation of 26 U.S.C.,

9    Section 5861.

10          That preliminary hearing is a hearing you can

11   require to be held.  At the hearing the government

12   would have to put on enough evidence to support a

13   finding of probable cause in support of those two

14   charges.  That means enough evidence for a reasonable

15   person to believe that you committed those offenses.

16          You'd have the right to counsel, the right to

17   see the evidence against you, the right to

18   cross-examine witnesses that testify, and the right to

19   put on proof of your own.  Do you understand all those

20   rights?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  If after the preliminary hearing

23   I find there's no probable cause, any charge I make

24   that finding on would be dismissed most likely without

25   prejudice.  Do you understand that?

1    THE DEFENDANT:  Yes, Your Honor.

2    THE COURT:  But if after the preliminary

3 hearing I find that there is probable cause, you'd be

4 held over for further steps in the case, and

5 specifically the government would have to obtain an

6 indictment within 30 days of the date of your arrest.

7 Do you understand that?

8    THE DEFENDANT:  Yes, Your Honor.

9    THE COURT:  Also, you need to know that if

10 there's no probable cause, the government doesn't have

11 a right to seek your detention; you'd be released.  Do

12 you understand that?

13    THE DEFENDANT:  Yes, I do.

14    THE COURT:  Your lawyer's told me you intend

15 to stipulate to probable cause, or, in other words,

16 waive your right to a preliminary hearing.  If you do

17 that, you're acknowledging that there's probable

18 cause, so the government then would have to obtain an

19 indictment within 30 days of the date of your arrest.

20    Also, if you acknowledge there's probable

21 cause by way of this waiver of your preliminary

22 hearing right, then the government has the right to

23 seek detention because it takes a probable cause

24 finding in order to have a detention hearing.  Does

25 all of that make sense to you, sir?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  I know I've covered a lot.  Do

3  you have any questions about anything I've described?

4          THE DEFENDANT:  No, Your Honor.

5          THE COURT:  All right.  Understanding all of

6  your rights, do you still wish to waive your right to

7  a preliminary hearing?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  Has anybody forced you in any way

10  or threatened you in any way or promised you anything

11  to get you to do that?

12          THE DEFENDANT:  No, Your Honor.

13          THE COURT:  All right.  I'll accept that

14  stipulation then as made in a knowing, voluntary and

15  intelligent fashion, so the government has to obtain

16  an indictment on these charges within 30 days of the

17  date of your arrest for them to continue, but we do

18  now have the ripe motion for detention.

19          Does either side have anything that we need

20  to take up before we begin the presentation of

21  evidence on the detention hearing?  Mr. Trimble?

22          MR. TRIMBLE:  Not on behalf of the United

23  States, Your Honor.

24          THE COURT:  All right.  Thank you.

25  Mr. Rossman?

1          MR. ROSSMAN:  Your Honor, I would just invoke
2   the rule on witnesses.
3          THE COURT:  Okay.  So the rule will be
4   invoked.
5          How many witnesses are you going to present,
6   Mr. Trimble?
7          MR. TRIMBLE:  One witness, Special Agent
8   Tremaine.
9          THE COURT:  All right.  Of course, he can
10  remain in the courtroom, but the defense witnesses
11  will then need to exit the courtroom, and you'll wait
12  to be called by the court security officer at the --
13  at the right time.
14         Anything else, Mr. Rossman?
15         MR. ROSSMAN:  Just for the record --
16         THE COURT:  Uh-huh.
17         MR. ROSSMAN:  -- the Court accepts the
18  stipulation that he's not a flight risk, correct?
19         THE COURT:  Sure.  The only question I'm
20  going to reach is whether there are conditions that
21  can be fashioned that would reasonably assure the
22  safety of any other person in the community.
23         MR. ROSSMAN:  Nothing further.
24         THE COURT:  Okay.  All right.  Mr. Trimble,
25  call your witness, please.

1     MR. TRIMBLE:  Your Honor, preliminarily,
2  before calling Agent Tremaine, one thing that I wanted
3  to -- to take care of procedurally, we have several
4  exhibits to bring before the Court.  There is, as you
5  mentioned, overlap in this case because of the nature
6  of the charge being involved significantly in the
7  danger element.
8     We have several exhibits in this case.  I've
9  got those prepared to provide to the witness.  I've
10 given a copy of all of those exhibits to Mr. Rossman.
11 I have a bound copy of all those exhibits to tender to
12 you, Your Honor --
13     THE COURT:  Okay.
14     MR. TRIMBLE:  -- if you have no objection to
15 that.
16     THE COURT:  Sure.  That's fine with me.  Is
17 there an objection, Mr. Rossman?
18     MR. ROSSMAN:  No, Your Honor.
19     THE COURT:  All right.  Sure.  Pass those up.
20 That would be great.  Thank you.
21     MR. TRIMBLE:  And having established that, I
22 would now call -- the United States would call Special
23 Agent Todd Tremaine.
24     THE COURT:  Okay.  If he could approach to be
25 sworn.  Thank you.

                    Government's Proof

         [THE WITNESS TODD EDWARD TREMAINE WAS SWORN]

         THE COURT:  I'll ask the first couple of
questions, Mr. Trimble.

         Good afternoon again.  State your full name,
please.

         THE WITNESS:  Todd Edward Tremaine.

         THE COURT:  Spell the last name, please.

         THE WITNESS:  T-R-E-M-A-I-N-E.

         THE COURT:  Okay.  You're familiar with
the -- the rules.  And if you're asked about any
minors, try not to reveal their name.  And if you're
asked about any residential addresses, try not to
reveal the street number, but we can clean it up if
that happens.

         Go ahead, Mr. Trimble.

                    DIRECT EXAMINATION

     BY:  MR. TRIMBLE:

     Q.     Agent Tremaine, how are you employed?

     A.     I'm a special agent with the Bureau of
Alcohol, Tobacco, Firearms and Explosives.

     Q.     And can you tell the Court a little bit
about your training and experience in the
investigation of criminal matters, including the
investigation of cases involving destructive devices.

1    A.    Yes.  I've been an ATF agent for

2 approximately 15 years.  At the ATF National Academy

3 we get a good foundation for training in explosive

4 investigations to include explosive identification,

5 post-blast investigations, explosive storage, and

6 that's for every ATF agent.

7         In 2010, I became a Certified Explosives

8 Specialist for ATF, and we use the term CES as an

9 acronym for Certified Explosives Specialist.  There

10 are approximately 270, 280 CESs nationwide with ATF.

11        We provide support for ATF agents and for

12 other state and local law enforcement agents, or

13 agencies in the handling, identification, use,

14 disposal of explosives and post-blast investigations.

15        We investigate bombings, thefts of

16 explosives, and any and all matters relating to the

17 storage, misuse, diverting of explosives to the --

18 into criminal hands.  Anything and everything

19 explosives we handle.

20        We also keep a working knowledge of

21 commercial explosives, improvised explosive devices,

22 how they function, homemade explosives, and basically

23 anything and everything explosives, we -- we are the

24 experts on -- for the United States government.

25    Q.    And we're here today on the charges

against Mark Sawaf.  Are you familiar with that individual?

     A.     Yes.

     Q.     Now, before the circumstances that led to the current investigation, ATF has investigated Mr. Sawaf in the past; is that correct?

     A.     That's correct.

     Q.     And what was the nature of that investigation?

     A.     That investigation arose, I believe, somewhere in late 2014, early 2015, when the Harlan Police Department contacted Special Agent Rick McMahan with ATF.  They contacted him about complaints they had received about Mr. Sawaf using exploding targets in -- in or around his residence in Harlan County, and Special Agent McMahan responded.

     Q.     And what are exploding targets or -- what are exploding targets?

     A.     Okay.  Exploding targets are things that you can buy at shooting stores.  They're commercially made.  They're a binary explosive mixture.  The reason you can -- they can be sold at stores is because they are not mixed.  Most exploding targets, and to include the most common one, is Tannerite.  They are about a 90 percent mixture of ammonium nitrate mixed with a

ten percent mixture of finely ground aluminum powder.

These exploding targets, once mixed, become an explosive and then subject to storage violations. If they are stored overnight, they have to be used that day.

These exploding targets once mixed and once hit with a high velocity round, like a .223 caliber rifle or a .762, they'll explode. And it was mainly used for long-distance shooting for people who are shooting long, long distances and they can't see where they hit, they can shoot the target and see the smoke. But these are the exploding targets that are -- they're found on the Internet and locally.

Q.    Now, are exploding targets in and of themselves illegal?

A.    No.

Q.    But can you use or possess exploding targets illegally?

A.    Yes.

Q.    Can you explain how you can do that.

A.    Sure, multiple ways. The first way, like I alluded to earlier, is once you mix it, if it's not stored properly in an ATF magazine because now it's a hot explosive, once it's mixed and it's not stored properly, you're subject to ATF regulations on storage

1  magazines.

2        The second way you can misuse it is just like

3  any other explosive, you can use it in a bomb.  You

4  can use it in a destructive device.

5        The combination of ammonium nitrate and

6  aluminum powder is commonly used in destructive

7  devices, in IEDs overseas that our troops have seen in

8  the last 10 to 15 years in Afghanistan and Iraq.

9        Q.     Okay.  Now, did ATF determine that it was

10  illegal for Mr. Sawaf to be in possession of these

11  exploding targets?

12        A.     They determined that based on their

13  information at the time that Mr. Sawaf was not

14  prohibited to possess explosives or the exploding

15  targets, that he was using them lawfully.

16        Q.     Did ATF pursue any charges against

17  Mr. Sawaf at that time?

18        A.     They did not.

19        Q.     And where was this activity involving

20  Mr. Sawaf and the exploding targets taking place?

21        A.     In the area around the Red Dog Road area

22  in Harlan County.

23        Q.     Okay.  Now, concerning the current

24  investigation into Mr. Sawaf, how did that begin?

25        A.     Sure.  On May, or, sorry, on June 6th of

2016, ATF was contacted by an investigator for the
Duracell Battery Company.  The investigator named Jeff
Key is a retired ATF agent.  He's also a retired
Certified Explosives Specialist like myself.

He contacted ATF and informed ATF that he was
investigating an incident where a trail camera, a
Wildgame trail camera exploded on an individual on May
5th.  The individual's name was Dustin Hall.

Mr. Key was contracted by Duracell because
Duracell had been put on notice by the victim's
attorneys that they were intending to file litigation
against either Duracell or the camera manufacture.
And so Mr. Key was down there to investigate whether
this was an actual exploding battery or something
else.

When Mr. Key arrived, he, along with some
electrical engineers with the Wildgame Company --
Wildgame Camera Company and Duracell individuals and
attorneys for the victim, they responded to the scene
and the scene that, according to Mr. Key, had been
preserved by the family.  It was in the garage of
Mr. Hall's residence that he shared with his family.

Once Mr. Key observed what he thought was a
post-blast scene and not a battery, an exploding
battery, he contacted the authorities, and that

included ATF and the Kentucky State Police.

Q.      And did ATF follow up on this information that they found?

A.      We sent an ATF bomb technician and two additional bomb technicians, one with the Lexington Police Department and one with the Kentucky State Police that day.

Q.      And did ATF also interview the individuals who had been involved with those trail cameras?

A.      Yes.  They interviewed Mr. Hall and his family and also Mr. Key, the investigator.

Q.      Did ATF also interview Aaron Noe?

A.      Yes.  They interviewed Aaron Noe as well. What we learned from those interviews is that Mr. Hall had basically had been given two trail cameras by Aaron Noe that was almost -- he was going to purchase it, if they worked.

So Mr. Noe had found these cameras in approximately March or April of 2016.  He had found them on a trail on the -- I guess in the Red Dog Road area of Harlan County, which is an area that is commonly used by ATVs, hunters.  It goes from private land to public land both ways.  But this area was on private land.  And Mr. Noe found the two cameras on the trail.  He brought 'em and asked Mr. Hall if he

would like to purchase them.  Mr. Hall stated he would
purchase them, if they would function.

So Mr. Hall took the two cameras to his
residence, and there they sat.  Mr. Hall was preparing
for a -- to write a paper on the morning of the
incident on May 5th of 2016, when he decided to hook a
battery up to one of the cameras.

According to Mr. Hall's statement, he took
the camera out, inserted batteries, and pressed the
"on" button.  What he did, nothing happened, but he
heard a sound coming from inside the camera.  He
thought he had basically fried the circuitry of the
camera.  Then he opened it up and he saw some smoke.
He then saw a white flash and an explosion.

Mr. Hall immediately ran outside thinking
that the battery exploded, thinking that he had
battery acid on him.

Once he got outside, he realized the extent
of his injuries.  Mr. Hall noticed that he was missing
fingers and was bleeding heavily, and ran back inside
and called for his mother and father to come help.
And Mr. Hall was transported by EMS to the hospital,
and then to the University of Kentucky Medical Center.

Q.     Agent Tremaine, I'm going to tender to you
what's been preliminarily marked as Government's

1  Exhibit Number 1.

2      THE COURT:  Any objection to that being

3  tendered, Mr. Rossman?

4      MR. ROSSMAN:  No, Your Honor.

5      THE COURT:  Okay.  That can be tendered to

6  the witness.

7      Q.    Are you familiar with this document, Agent

8  Tremaine?

9      A.    Yes.

10     Q.    And where did it come from?

11     A.    This document was -- this image was

12 provided to ATF by Mr. Hall's attorneys, the family

13 attorney.  This image was taken of Mr. Hall's hand

14 while at the hospital.

15     Q.    And before the trail camera exploded,

16 Mr. Hall had all of his fingers intact; is that

17 correct?

18     A.    That is correct.

19     MR. TRIMBLE:  I'm now going to tender to you,

20 if there's no objection, what has been previously

21 marked as Government Exhibit 2.

22     THE COURT:  Mr. Rossman?

23     MR. ROSSMAN:  No objection, Your Honor.

24     THE COURT:  Let's just ask, have you seen all

25 the exhibits, do you think?

1          MR. ROSSMAN:  I have, Your Honor, and I don't
2    have any objection to him just tendering them to the
3    witness as they're presented in this booklet.
4          THE COURT:  Okay.  Fair enough.  That can be
5    tendered.  Thank you.
6          Q.      Are you familiar with this document, Agent
7    Tremaine?
8          A.      Yes.
9          Q.      And where did this document come from?
10         A.      This is an image that was taken from
11   Mr. Hall's garage.  This image was provided to ATF by
12   the attorney for Mr. Hall.  This image was taken in
13   the garage, and it is of the outer shell of the Primos
14   Wildgame Camera.
15         Q.      And this is one of the cameras that was in
16   the possession of Mr. Hall; is that correct?
17         A.      That's correct.  This is the one that was
18   in possession of Mr. Hall on May 5th, when it
19   exploded.
20         MR. TRIMBLE:  Okay.  I'm going to tender to
21   the witness what's been preliminarily marked as
22   Exhibit 3.
23         Q.      Take a look at that, Agent Tremaine, and
24   when you have looked it over, let us know if you're
25   familiar with that document.

A.      I'm familiar with this.

Q.      And where did that come from?

A.      This photograph was taken by ATF.  This is a trail camera that Mr. Hall had in his possession. He had two that he had received from Mr. Noe, the one that he had put the batteries in and applied power to that exploded, but he had a second one.  He notified ATF of this, and this was a photograph taken by Special Agent Bomb Technician Sean Moorman of the device of the trail camera once it was opened.

Q.      And just to clarify, was this trail camera found by Mr. Noe at the same time as the Primos camera that exploded?

A.      Yes.

Q.      And they were both given to Mr. Hall?

A.      That's correct.

Q.      Okay.  Now, is -- if -- can you please describe what you see inside of this trail camera.

A.      Sure.  This camera is, for lack of a better term, is fileted open; it's open, and you see two sides.

Now, this would not be what you would look at once you -- if you just opened the camera up as a consumer.  This has been unscrewed, so now you see the circuit board to the right.  You can also see the lens

1 to the right and some wires going to the left side.

2          The left side is what concerns me as an

3 explosives specialist and an ATF agent.

4          The right side is mostly the circuit boards

5 that I would anticipate I could see some capacitors,

6 microchips and things that I would expect to see on a

7 circuit board.

8          On the left side I see wires running from the

9 circuit board.  I see a red wire and a black wire;

10 they're running almost together.  The black wire's a

11 little hard to see, but you can see it as it starts

12 from the circuit board side, and it goes right down to

13 the left side, to the bottom left side of the picture.

14          In that you see that there is a multi-strand

15 wire -- the red wire is multi-strand, and it attaches

16 to an orange-coated wire.  That orange-coated wire

17 then runs to a clip.  That black clip in -- and it's

18 in the, I guess, almost mid-way up or just short of

19 mid-way up.  There's a black clip that is holding a

20 green fuse.  You can see a little bit of the green

21 hobby fuse.

22          This wire is going to the -- is going to the

23 clip, and the clip is now attached to the green fuse

24 which goes into what we have determined is a spent

25 nine millimeter casing.

         We've examined this thoroughly.  And what
we've come up with is this is a spent nine millimeter
casing filled with some -- with some sort of explosive
mixture.  We don't know exactly what it is, but we
have conducted a field test on it, and it does test
positive for an explosive mixture.

         The green hobby fuse and the hot glue are
attached to the top of it, and the orange wire appears
to be a consumer firework ignitor.  Consumer firework
ignitors are used commonly by people who want to light
off fireworks at the 4th of July.  If you don't want
to just use a match, you can use electricity to supply
current.  Once current is applied, it basically warms
up a bridge wire in the clip.  And once the bridge
wire gets warm, it gets hot enough, it's going to
basically ignite the green hobby fuse, which in turn,
goes in and further ignites the low explosive powder
contained in the nine millimeter shell.

         Q.     Now, how this is device designed to
function?

         A.     This device is designed to function by
once power is applied to -- if you see the red and
black wires that run down -- once power is applied to
those -- to those wire -- now, I can't say a hundred
percent it's whether when the batteries are put in, or

1    when the -- when it is turned on.  But once power's

2    applied to those wires, electric current's going to

3    flow from the negative wire, complete a circuit, and

4    fire your device.  So once electricity is through

5    there, through those red and black wires, it's going

6    to function.

7         And it would be consistent with Mr. Hall's

8    statement that once he put the batteries in and turned

9    the power on, that's when he heard something sizzle on

10   the inside and opened the device.

11        Q.    Would you describe this as a

12   victim-activated device?

13        A.    Yes.  We have several devices that we

14   investigate as, you know, a Certified Explosive

15   Specialist.  This one is a victim-activated device.

16   Some are command controlled by the bomber; some are

17   victim activated.  This is definitely a

18   victim-activated device.

19        Q.    Are you aware of any other purpose for

20   this device other than as a weapon designed to harm

21   someone who has inserted a battery and turned on the

22   device?

23        A.    No.

24        Q.    Now, recognizing that laboratory

25   examination is ongoing, based on your training and

1  experience and your preliminary assessment, would you

2  preliminarily categorize this device as a bomb or

3  similar device?

4      A.      Yes.

5      Q.      Would you say that it's designed to

6  explode?

7      A.      Yes.

8      Q.      And would you categorize this as a

9  destructive device?

10      A.      Yes.

11      Q.      Now, when you examined the photographs

12  from the Primos camera that exploded, were you able to

13  find any of the elements that you've described with

14  the Wildgame Innovations Trail Camera with the Primos

15  debris --

16      A.      Yes.

17      Q.      -- from the explosion?

18      A.      Yes, we have.

19      Q.      Can you describe that.

20      A.      Yes.  In the photographs that were

21  provided to us by the attorneys for Mr. Hall, we found

22  pictures of this black clip that is basically -- it's

23  attached to the consumer firework ignitor.  You buy

24  those in tandem; they are together.  We found pieces

25  of that on the pictures.  We also collected those at

the scene.  Now, this was a month later after agents
were there, but we did collect portions of that.

            But right after the incident, the family took
photographs, and that can be seen.  And additionally,
we see portions of the orange wire; it's
orange-coated, single-strand wire that is again,
common to be used in either electric detonators,
electric matches or consumer firework ignitors.

      Q.      All right.  Now, ATF conducted interviews
with individuals concerning the property where the
trail camera was found; is that correct?

      A.      That's correct.

      Q.      And some -- and multiple individuals
indicated that they had seen Mark Sawaf on this
property; isn't that correct?

      A.      That is correct.

      Q.      And these individuals, they knew Sawaf,
had personal interaction with him; is that correct?

      A.      Yes.

      Q.      And this property was owned privately by
the Bennett Family; is that correct?

      A.      Yes.

      Q.      And through -- and through interviews of
individuals, was ATF informed that Mark Sawaf was not
authorized to be on this property?

A.      Yes.

Q.      Did the witnesses that ATF interviewed provide any information about trail cameras that were found on this property?

A.      Yes, they did.  There was -- there were two individuals that we talked to first, Joseph Bennett and Kevin Jump, who were both authorized users of the property.  Jump and Bennett both claimed to seize multiple trail cameras from the property.  Jump seized a trail camera on one occasion and found a photograph of Sawaf on the SD card of the trail camera.

There was another individual, Pope, I believe was his last name.  He was also an authorized user at this property.  He found four to five cameras on the property, and he believed those to be Mark Sawaf's because they had the initials "M.S." on them.

Pope knew Sawaf.  He also said that Sawaf had messed around with one of his cameras because he saw evidence of Sawaf opening the camera, closing this camera on his photo log on his SD card for his camera.

Q.      Did any of the witnesses mention that there had been evidence of an explosion on the property?

A.      Yes.  Mr. Pope.  Mr. Pope explained in

September of 2015, he was checking on his tree stand
and feeder for deer.  When he went to the property --
and this was in the Red Dog area of Harlan County --
when he went to find his tree stand, he noticed, I
believe, the seat cushion way up in the trees.  He
looked for his tree stand, and couldn't find it.  He
looked and saw the bark was removed, and it appeared
to him that the tree stand had been blown out of the
tree, as well as one of his feeders.

     Mr. Pope had also said he had heard several
complaints about Mr. Sawaf being up in the area
shooting Tannerite and other items, and he -- he -- it
was his belief that Mr. Sawaf had blown up his tree
stand.

    Q.    Did ATF conduct interviews with the
neighbors of Mr. Sawaf?

    A.    Yes.  The neighbors of Mr. Sawaf reported
a loud explosion from his residence in December or
January, December of 2015, or January of 2016, in the
middle of the night.  They explained it as a loud
explosion and with I believe a large amount of white
smoke coming from the residence of Mr. Sawaf's
property.

    Q.    ATF received information that Mr. Sawaf
attempted to contact Dustin Hall, the victim; isn't

1 that correct?

2     A.      Yes.

3     Q.      All right.  And following that, ATF

4 conducted a trash pull of Mr. Sawaf's residence in

5 Harlan County; is that correct?

6     A.      That is correct.

7     Q.      How did they know that it was his

8 residence, without going into the specifics of his

9 address?

10     A.      Okay.  They had talked to locals in the

11 area, to include law enforcement, and we had also

12 looked on his driver's license, and everything

13 confirmed that this one particular residence, the

14 numerics and the street were his, both by witness

15 interviews and by searching the Kentucky driver's

16 license database and other databases that we have.

17     Q.      And in the course of the trash pull, what

18 are some of the -- without going through every --

19 exhaustively going through everything that was in the

20 trash, what are some of the -- the items that was

21 found in the trash pull that were of particular

22 interest to you as a Certified Explosives Specialist?

23     A.      Okay.  They found orange wire; it was

24 single-strand copper wire in duplex configuration with

25 a bonded orange insulator.  This is very consistent,

if not identical, to what we found in the intact trail
camera at Dustin Hall's residence.

Q.     And, Agent Tremaine, I'm handing you
what's been preliminarily marked as Government Exhibit
Number 4.  Take a look at that.  And when you're
satisfied, could you let us know if you're familiar
with this document.

A.     Yes, I am.

Q.     And where did this document come from?

A.     This was a photograph taken by ATF agents
following the trash pull.  This item was removed from
Mr. Sawaf's discarded trash.

Q.     All right.  Can you -- can you continue
with items found during the trash pull.

A.     Sure.  Yeah.  A one-inch length of the
orange-color wire insulation.  It did not have the
wire in it.  This would be consistent with somebody
who is stripping the wires.  You want to expose the
copper wire on the inside to allow metal to connect
with metal if you're doing any sort of wiring, so we
found a one-inch length of that.

We found a Primos Hunting Trail Camera
warranty information card with hot glue attached the
card.  We additionally found a -- go ahead.

Q.     Excuse me, Agent Tremaine.  I'm going to

tender to the -- what's been preliminarily marked as
Exhibit 5.  When you receive it and take a look at it,
let us know if you're familiar with that document.

A.    Yes.  I'm familiar with it.

Q.    And where'd that come from?

A.    The trash at Mr. Sawaf's residence.

Q.    Where did the document come from?

A.    Oh.  The document is the photograph taken
by ATF agents following the trash pull.

Q.    And what is that?

A.    That is the -- the Primos warranty
information for the trail camera.  And you can see
almost in the upper right-hand corner into the top
some of the hot glue that was attached to it.

Q.    Okay.  Can you continue with items found
in the trash pull.

A.    Yeah.  A user's manual for a Wildgame
Innovations Camera Model M8 Trail Camera.  I should
probably note that's the same model and manufacturer
as the one that was recovered from Dustin Hall's
residence, the one we looked at the photographs with
the intact explosive device inside.

Q.    Agent Tremaine, I'm handing you what's
been preliminarily marked as Exhibit 6.  When you've
taken a look at it and are satisfied, please tell the

1  Court whether you're familiar with this document.

2      A.      Yes.  I'm familiar with it.

3      Q.      And where did that document come from?

4      A.      It was a photograph taken by ATF agents

5  following the trash pull at Mr. Sawaf's residence.

6      Q.      And were there any additional -- was there

7  any additional document or literature relating to

8  other trail cameras in the trash pull as well?

9      A.      There were, yeah -- yes.

10     Q.      Okay.  Can you continue with items that

11 were found in the trash pull.

12     A.      Sure.  There were shotgun shells that

13 appeared to have been cut and sustained thermal

14 damage.  It appeared they'd been tampered with, not

15 used as they were intended to, and had sustained a

16 pretty amount of high heat or thermal damage to them.

17 That damage would be consistent with research and

18 development and even experimentation that we usually

19 see conducted by people who are manufacturing IEDs.

20         We found a metal screw 3/8 inches in

21 diameter, consistent with the screws that were removed

22 from the Wildgame camera, the one we had that was

23 intact, two fire crackers that were intact,

24 unexploded, a magazine addressed to Mark Sawaf, and a

25 handwritten note that we found in the trash that said,

"Broken camera for a broken soul."

Q.      Agent Tremaine, I'm handing you what's been preliminarily marked as Government Exhibit 7. Would you please take a look at that and make sure you're comfortable with it and let the Court know if you're familiar with that document.

A.      Yes.  I'm familiar.

Q.      And where'd that document come from?

A.      It's a photograph taken by ATF agents.

Q.      And is that the handwritten note that you just referred to?

A.      It is.

Q.      Okay.  Did ATF conduct an interview with Mark Sawaf on June 21, 2016?

A.      Yes.

Q.      Did he admit that he was the sole resident of the home that was searched?

A.      Yes, he did.

Q.      Did he admit to manufacturing any IEDs?

A.      No, he did not.

Q.      Had he had any involvement -- did he admit to any involvement with explosion material -- explosive material?

A.      Yes.  He admitted that he had manufactured exploding targets, Tannerite, and he also admitted to

making black powder.

He admitted he has purchased ammonium nitrate pellets, which is a precursor to an explosive. He also advised that during 2015, while making some of the black powder, he would place a portion of the powder, as well as gun powder, in the cartridges for -- gun powder from the cartridge in an ashtray and would light them to ignite the powder. He said sometimes it burned, sometimes it exploded.

We'd asked him if he had ever searched for how to make explosives, and he said, No, but he had watched You Tube videos about how to make black powder and Tannerite. And he admitted, you know, just -- I guess some of the -- just some of the -- doing some procedures, mixing of powders, but never any devices.

Q.    Did Mr. Sawaf indicate where he acquired the material to mix -- to make the mixtures that you've referenced?

A.    He did.

Q.    Where was that, some of them?

A.    Some -- some of them, he said that some of them he had purchased online.

Q.    Did Mr. Sawaf admit that he had placed powder in containers at the shell casings or prescription bottles to ignite the powder?

1     A.      Yes.

2     Q.      And did Mr. Sawaf deny having made a seal

3 using hot glue on containers filled with powder before

4 igniting them?

5     A.      Yes.  He denied that.

6     Q.      Did Mr. Sawaf deny inserting a wick or a

7 fuse into shell casings?

8     A.      Yes.  He denied that.

9     Q.      Did ATF personnel ask Mr. Sawaf about the

10 note that read, "Broken camera, broken soul?"

11    A.      Yes.  He was asked about the note.  He

12 admitted that he wrote the note in the past after

13 having several cameras -- several of these trail

14 cameras stolen from him.  He explained to ATF agents

15 that he wanted to place the note in a broken camera

16 for a thief to steal, almost like a prank.

17    Q.      And did ATF personnel ask Mr. Sawaf about

18 the visit to Mr. Hall?

19    A.      Yes.  Mr. Sawaf did admit to attempting to

20 contact Mr. Hall.

21    Q.      Now, did ATF personnel conduct a

22 warrant-based search of the residence of Mark Sawaf on

23 June 21, 2016?

24    A.      Yes.

25    Q.      And similarly to the trash pull, can you,

without going into detail about every item that was
found or recovered, can you discuss some of the items
that you, as a Certified Explosives Specialist, found
to be of particular interest?

A.      Yes.   The first one was a .410 shotgun
shell that had been tampered with and improvised.
We've determined it was a shell containing and
explosive filler.  We've tested the explosive filler.
It tests positive for being an explosive powder.

It had hobby fuse protruding from the shell
with a -- and it was sealed with hot glue coming from
the end opposite of the primer.  It was the same
general configuration of the main charge of the
Wildgame camera that we seized from Dustin Hall's
residence on June 6th.

Q.      I'm handing you what's been preliminarily
marked as Exhibit 8.  Look it over, and when you're
comfortable, let -- let the Court know whether you are
familiar with this exhibit.

A.      Yes.  I'm familiar with this exhibit.

Q.      Is that the device that you've just been
describing?

A.      Yes.  It is the device that I just
described, the .410 shotgun shell.

Q.      Now, recognizing a laboratory

examination's ongoing, based on your training and
experience -- your preliminary assessments, would you
preliminarily categorize this as a destructive device?

Q.      Yes, I would.

Q.      Is it designed to explode?

A.      It is.

Q.      And could this be useful for any other
purpose, to any other lawful purpose that you're aware
of besides being used as a weapon?

A.      I know of no other lawful purpose, other
than being a weapon.

Q.      Okay.  Were there other items of interest
that were found in the trash pull -- I'm sorry, excuse
me, in the search of the home?

A.      Yes.  Additionally, like this .410 shotgun
shell, there was a .12 gauge shotgun shell that was
found in a bag on his front porch.  This .12 gauge
shotgun shell again, had been tampered with.  It
contained an explosive filler and glue on the end.  It
had no hobby fuse, unlike the previous exhibit, but it
was made in similar configuration as the last exhibit
and the one in the -- the main charge in the other
trail camera.

Q.      All right.  I'm tendering you what's been
preliminarily marked as Government Exhibit 9.  Would

you please look at it, and when you're comfortable,
please let us know if you are familiar with this
document.

A.    Yes.  I'm familiar with this document.

Q.    Now, is that the device that you've
previously mentioned?

A.    Yes.  This is the photograph taken by ATF
agents at the search at Mr. Sawaf's residence.

Q.    Now, recognizing that laboratory
examination is ongoing, based on your training and
experience and your preliminary assessments, would you
preliminarily categorize this device as a destructive
device?

A.    Yes.

Q.    Is it designed to explode?

A.    Yes.

Q.    And you -- are you aware of any other use
lawfully that this device could be used for except for
use as a weapon to harm someone?

A.    I know of no other use.

Q.    Okay.  Were there other items of interest
that you found during the search of the home?

A.    Yes.  We found green hobby fuse, which is
similar to what we found in Government's Exhibit 8,
and also green hobby fuse was found in the intact

camera that we found at Mr. Hall's residence. We also
--

    Q.     I'm handing --

    A.     I'm sorry.

    Q.     -- I'm handing you what's been
preliminarily marked as Government Exhibit 10. Could
you please take a look at it, and when you're
comfortable, let us know if you're familiar with this
document.

    A.     I'm familiar with this document.

    Q.     Is the hobby fuse that you just mentioned,
is it located in that photograph?

    A.     It is.

    Q.     Can you identify where it is for the
Court.

    A.     It is directly in the middle, attached --
or right next to this black cylindrical item. Right
here.

    Q.     Is a hobby fuse like this, is it used in
the making of exploding targets?

    A.     No.

    Q.     This is -- I've just handed you
Government's Exhibit 10. Looking back at Government
Exhibit 9, is that used in any way that you're aware
of in exploding targets?

A.      No.

Q.      And the same question for Government Exhibit 8 that I've previously given to you.  Is that device used in any way that you're familiar with in the manufacture or use of exploding targets?

A.      No.

Q.      Okay.  Were there other items of interest that you found in your examination of the results of the search warrant?

A.      Yes.  Pieces of the orange insulation that was consistent with being stripped from the wire, similar to what we found in the trash pull, and again, very consistent with the consumer firework initiator that was found in the destructive device that was found inside the trail camera at Mr. Hall's residence.

We found trail camera parts on the workbench in the kitchen area.  There's a workbench in the kitchen area of the residence.  Several of the lights and other trail camera parts, you could tell that he had taken several trail cameras apart in that area of the kitchen.

Previously melted hot glue, a hot glue gun, hot glue sticks.

Several explosive powder mixtures, including the clear plastic jug containing a fine powder.  At

this point, we either suspect it to be -- suspect it to be an explosive powder, or at least a precursor to an explosive powder.

A rock tumbler, which is very common for people who are making explosive powders.  They want to get the powders as fine as possible.  That way if you're dealing with, like, black powder and you're grinding charcoal, you'd want to use the rock tumblers.  Or you're taking aluminum -- you could even take that aluminum foil, finely grind that in the rock tumbler and get a -- the finely ground aluminum powder like you would have for Tannerite.

Ten flashlights found in the work bench area. These are of note to me because we found portions of an exploded flashlight in the front yard, and this -- flashlight devices are very similar devices that we see that would be another type of victim-activated devices.  Once the victim turns on the device, the flashlight wouldn't explode in their hands.

Let's see.  A metal flashlight housing that I alluded to that has flash damage.

And hot glue was in the front yard.  A section of a shotgun shell casing infused with hot glue was in the front yard.

A section of PVC pipe, which is another way

1  to confine explosive powder.  We've heard the term

2  pipe bomb.  PVC pipe's commonly used in that matter.

3       Q.       Agent Tremaine, I'm handing you what's

4  been preliminarily marked as Government's Exhibit 11.

5  Could you please take a look at this.  And when you

6  are comfortable, please let us know if you're familiar

7  with that document.

8       A.       Yes.  This appears to be part of the

9  flashlight that was found in the front yard.

10      Q.       Okay.  And then I'm also handing you

11 what's been preliminarily marked as a Government's

12 Exhibit 12.  I need to wait on Government's Exhibit

13 12.  Sorry to get you off.  Can you continue with the

14 --

15      A.       Sure.

16      Q.       -- items that were --

17      A.       Sure.

18      Q.       -- that were found during your -- the

19 search warrant?

20      A.       Yes.  Yeah.  We found orange wire that had

21 been cut.  Again, extremely consistent, if not

22 identical, to the wire that was found in the camera

23 that had the destructive device in it at Mr. Hall's

24 residence.

25           This orange wire, again, is single-strand,

but fashioned in a duplex configuration with orange

coating.  It's a low-gauge wire commonly used in

either detonators, electric matches, electric squibs

or consumer firework ignitors.

Wire cutters, which had hot glue on them.

Two five-pound containers of ammonium

nitrate, as well as iron oxide.  These are both

precursors to binary explosive mixtures.  As we

alluded to earlier, ammonium nitrate mixes with

aluminum powder, but it can also mix with other fuels.

Ammonium nitrate was used in the Oklahoma City

Bombing.  Any -- ammonium nitrate is an oxidizer,

mixed with a heavy fuel is going to be an explosive.

So ammonium nitrate with aluminum powder, ammonium

nitrate with iron oxide, or ammonium nitrate with any

sort of fuel is going to create an explosive.  That

was found in the upstairs area.

We found six trail cameras, a handwritten

note detailing various explosive mixtures, two

receipts that would look -- that appeared to be online

purchases for trail cameras, and various explosive

powders throughout the house that samples were taken

and a lot were destroyed onsite.

Q.     Now, Agent Tremaine, I'm going to be

handing you what's been preliminarily marked as

1  Government Exhibit 12.

2      Can you please take a look at that document,

3  and when you're comfortable, can you let us know if

4  you're familiar with it.

5      A.      Yes.  I'm familiar with it.

6      Q.      And what is that document?

7      A.      This is a photograph taken by ATF agents

8  of a suspected explosive powder mixture that was found

9  in Mr. Sawaf's residence.

10     Q.      And can you tell us if -- if this material

11 was used in the making of an explosives device, what

12 kind of -- what kind of damage could be done?

13     A.      Sure.  As a Certified Explosives

14 Specialist, we commonly prepare our own devices, and

15 we do tests on, whether it be cars, rooms.  I just did

16 some at the Federal Law Enforcement Training Center a

17 couple weeks ago.

18         This amount of powder would blow a car and

19 everybody in it up.  It would blow out every window.

20 It would kill.  This amount of powder would do a lot

21 of damage.

22         Looking at the weight of the ammonium

23 nitrate, the five pounds, all of this would blow up

24 everybody in this room, to include a whole house.  I

25 wouldn't want to be anywhere in this courtroom with

this amount of powder in a device.

Q.     And you mentioned multiple devices that in the course of the search warrant was uncovered that in your training and experience preliminarily that appeared to be explosive devices and destructive devices; is that correct?

A.     Yes.

Q.     And has anyone else in ATF's consultation reached a similar conclusion upon preliminary examination?

A.     Yes, they have.  We've had both Special Agent Bomb Technician Sean Moorman and AFT Explosive Officer Mike Edelsten have examined all of these items, both by hand and through pictures initially, and they examined them by hand today, and they -- especially Mr. Edelsten, have determined that these are destructive devices, the ones I referred to earlier as the 5845(F).

Q.     And in reviewing the National Firearms Registration and Transfer Record, were any of these devices registered to Mr. Sawaf?

A.     No.  We -- we have queried him twice, with most recently being around 12:00 today in the National Firearms Registration or Transfer Record, and Mr. Sawaf has no firearms to include destructive

1 devices registered to him in -- in that Registry.

2     Q.    Okay.  And moving on from the search

3 warrant, has ATF received reports from other exploding

4 trail cameras in Harlan County?

5     A.    Yes.

6     Q.    And did -- can you -- can you discuss what

7 ATF has found preliminarily in those investigations?

8     A.    Yes.  The ATF interviewed an individual

9 named Ricky Skidmore.  Mr. Skidmore had been

10 transported to the hospital in March of 2016, late

11 March.  It was March 23rd or March 27th.  He had been

12 transported to the hospital, and subsequently to the

13 University of Kentucky Hospital after sustaining

14 blasting ...

15         [AT THIS POINT, THE DIGITAL RECORDING

16 ABRUPTLY STOPPED RECORDING]

17         [IN OPEN COURT - 4:44:41 p.m.]

18         THE COURT:  Okay.  Sheila, did you check the

19 file?

20         DEPUTY CLERK:  It will be on the hard drive.

21         THE COURT:  All right.

22         DEPUTY CLERK:  We can't open it like we

23 normally would --

24         THE COURT:  Right.

25         DEPUTY CLERK:  -- but it will be on the hard

1  drive; I'm positive.

2       THE COURT:  Okay.  So do we think it would

3  have recorded up to the point in time which the

4  computer crashed?

5       DEPUTY CLERK:  Yes.

6       THE COURT:  All right.  Is that the back-up

7  file on the hard drive?

8       DEPUTY CLERK:  Yes, sir.

9       THE COURT:  Okay.  All right.  Well, counsel,

10  I don't know what else to do except try to complete

11  Agent Tremaine's testimony.

12       Sheila, how long would it take for you to

13  take to make sure that file is there?

14       DEPUTY CLERK:  Five minutes.  We let Brent

15  leave, didn't we?

16       THE COURT:  Yeah.

17       COURT SECURITY OFFICER:  No, he's here.

18       DEPUTY CLERK:  He can help me find it on the

19  hard drive.

20       THE COURT:  I want to know.

21       DEPUTY CLERK:  Okay.

22       THE COURT:  I want to know for sure that we

23  have the previous testimony recorded.  But it's late

24  as well.  So, let's -- let's confirm that that's there

25  before we try to pick back up.

1          All right.  Anything we need to take up,

2    Mr. Trimble?

3          MR. TRIMBLE:  Not on behalf of the United

4    States.

5          THE COURT:  Okay.  Mr. Rossman?

6          MR. ROSSMAN:  No, Your Honor.

7          THE COURT:  Okay.  So have Brent check, and

8    you all let me know.

9          DEPUTY CLERK:  Okay.

10         THE COURT:  Just call me in chambers.

11         We'll stand in recess.

12         [RECESS - 4:53:59 p.m.]

13         [IN OPEN COURT]

14         THE COURT:  All right.  I'm told that the

15   file's intact.

16         Special Agent Tremaine, you can -- you can

17   retake the stand.

18         My notes are that the last topic of

19   discussion was the interview of Ricky Skidmore.

20         So Mr. Trimble, do you want to just pick up

21   there?  Why don't begin with the questions about that

22   interview so that we can try to make sure we have a

23   complete record.

24         Q.     Okay.  Agent Tremaine, ATF has received

25   reports about other exploding trail cameras in Harlan

County; isn't that correct?

A.    Yes, that's correct.

Q.    And can you tell us about the ATF's investigation into those other reports.

A.    Yes.  ATF received information that an individual named Ricky Skidmore had been involved in an incident where a trail camera had exploded on him, and he was taken to the hospital, subsequently to the University of Kentucky Hospital with blast injuries.

ATF responded to Mr. Skidmore's residence and spoke with him on two different occasions. Mr. Skidmore advised that in I think it was around March 23rd of 2016, he was in the Red Dog Road area of Harlan County and saw a camera in a tree.  He removed the camera, took it home.

When he got home, he noticed it did not have any batteries in it, but it had some alligator clips coming out of where the battery compartment was.

He said that it was an older trail camera, and he wanted to see if it worked.  So he took the trail camera and took the alligator clips and applied them to a 12-volt battery.  He said when he did, he noticed that it started to smoke and make a sound. Almost within seconds, the device blew up on him, and he was holding it in between his legs.

1          Mr. Skidmore described his injuries, and he
2    showed some of the injuries.  Again, these were three
3    months old at this point, but he had injuries to
4    his -- pretty good traumatic injuries to his groin, to
5    his inner thigh, to his torso.  The hospital reports
6    confirmed that as well.
7          He also gave us his bloody jeans that also
8    had holes that would be consistent with blast injuries
9    in the jeans.
10          And prior to ATF responding, I believe
11   individuals from the Consumer Products Safety
12   Commission had also come out, as they were
13   investigating what could have been faulty trail
14   cameras, and they took some of the evidence into
15   custody, some of the post-blast, and we're still going
16   to get that from them.  That's in the process.
17        Q.     Were there any other reports of an
18   exploding camera in Harlan County?
19        A.     There -- there were.  There's one more.
20   ATF is still attempting to contact that victim at this
21   point.
22        Q.     All right.  Now, ATF has also received
23   information concerning Mr. Sawaf from a business
24   entity that competed with him in Harlan County; isn't
25   that correct?

```
 1        A.      That is correct.

 2        Q.      And what is the name of that business?

 3        A.      Addiction Recovery Care, ARC.

 4        Q.      And have you spoken with a representative

 5   of that company?

 6        A.      Yes.  I've spoke with the attorney Jessica

 7   Burke.

 8        Q.      What did Ms. Burke tell you?

 9        A.      Ms. Burke stated that she had --

10   represented Addiction Recovery Care, which had a, I

11   guess, counseling service in Harlan County, as well as

12   other locations throughout the state.

13             She explained that their company had several

14   interactions and even harassing communications from

15   Mr. Sawaf for the last six, seven months.  Those would

16   include harassing employees on Facebook messages, they

17   would include sending complaints to the state about

18   ARC's care, sending anonymous complaints to ARC,

19   creating bogus Facebook pages pretending to be ARC's

20   administrators or presidents, and mocking ARC's

21   practices, sending letters to ARC.

22             And then it -- it turned up a notch, I guess,

23   in March of 2016, and I guess prior to that, they had

24   received information from individuals who said that

25   Mr. Sawaf had showed them videos of him killing a
```

bobcat, or sorry, trapping a bobcat, and then killing it and skinning it.

And then in March of 2016, ARC found what appeared to be a skinned coyote carcass outside of their office in Harlan.

Then in May of 2016, after they had sent him some cease and desist letters for the communications that he had been engaging in with them, they received a package that was addressed from Mr. Sawaf wrapped in a cease and desist letter with a bow.  Inside was a whistle, a dark picture of a winged creature, which Ms. Burke described as "The Angel of Death," and writing in Arabic.

Again, they believed again, this was from Mr. Sawaf since it was dated from Mr. Sawaf -- or I guess the return mail was from Mr. Sawaf.  And with everything else that's going on, they were dealing with Mr. Sawaf on a weekly basis, whether it be harassing employees via communications, or making Facebook posts, posts on his business sites anti-ARC.

And so this was just something that she wanted to bring to our attention.  She called me yesterday and said that we had been fearful of Mr. Sawaf and they felt the duty to report this to ATF after they realized that he was arrested because they

believed he was dangerous.  And they felt that the
reason they would -- didn't report it before was
because had they reported it, they feared what he
might do to them or their company.

Q.    And my last question to you, Mr. -- Agent
Tremaine, is beginning -- you talked about, or you
talked about Mr. Sawaf's construction of Tannerite and
use of Tannerite, and throughout the course of our
discussion, you've mentioned destructive devices.  In
your training and experience, is that progression
unusual to you?

A.    The progression that I see from Mr. Sawaf
starting with the Tannerite back in 2014, 2015, it's a
national progression that we see from numerous cases
that ATF has investigated that I've been trained on
that I've been involved in.  This progression starting
with mixing of safe explosives, stuff that you can buy
at the store, stuff that's readily available.  Then
advancing to advanced circuitry, remote firing
systems, electric initiations, using batteries, mixing
different -- now not mixing Tannerite, but mixing
black powders, mixing them with shotgun shells, using
them -- this is a natural progression that we see
that's common from people who manufacture IEDs.

MR. TRIMBLE:  Your Honor, at this time, the

United States would move into evidence the exhibits
that have been presented, and then the United States
has, reserving the right for redirect, has no further
questions for Agent Tremaine.

THE COURT:  Any objection to the admission of
the photographs, Mr. Rossman?

MR. ROSSMAN:  No, Your Honor.

THE COURT:  Okay.  How long do you anticipate
your cross taking?

MR. ROSSMAN:  Ten (10) to 15 minutes maybe.

THE COURT:  Well, I think we should try to
conclude the presentation of this witness's testimony,
and then see where we are.

Is there any -- does anyone have any
scheduling concern?

MR. TRIMBLE:  No objection, Your Honor.

THE COURT:  All right.  Go ahead with your
cross then, Mr. Rossman.

MR. ROSSMAN:  Thank you.

THE COURT:  You're welcome.

                    CROSS-EXAMINATION

BY:  MR. ROSSMAN:

Q.     Good afternoon.  My name's Travis Rossman.
I represent Mark Sawaf.

A.     Good afternoon.

1     Q.     I want to talk to you a little bit about

2 your prior investigation of Mr. Sawaf that you've

3 discussed at the beginning of your testimony.  Did

4 that investigation reveal any illegal activity?

5     A.     No.

6     Q.     Was Mr. Sawaf arrested?

7     A.     No.

8     Q.     Did your investigation determine that he

9 was a prohibitive person?

10    A.     At that time or now?

11    Q.     At that time.

12    A.     At that time, no.

13    Q.     Was there any continued surveillance of

14 him after that investigation?

15    A.     No.

16    Q.     Is it safe to say that at that time, law

17 enforcement determined that he was not dangerous?

18    A.     We determined that there was no criminal

19 case that we could bring against him.

20    Q.     If he had been dangerous, would you have

21 continued to conduct surveillance on him?

22    A.     It would be tough to say.  We're a short,

23 small office here with two agents, and whether he's

24 dangerous or not, surveillance, unless he's doing

25 something that we can prosecute or something imminent.

1 We have a lot of dangerous people that I do not do

2 surveillance on. We just do not have the capability.

3      Q.     Well, would it be accurate to say that at

4 that point in time, he wasn't a high priority as an

5 investigatory target?

6      A.     That would be correct.

7      Q.     Okay. Is it safe to say that in Harlan

8 lots of people are interested in guns?

9      A.     I would assume so.

10      Q.     And that's kind of a rural area, correct?

11      A.     Yes. That would -- that's my assumption.

12 I'm from this area, so I would assume that would be

13 the case.

14      Q.     Okay. And within your familiarity of

15 Harlan, are there a lot of people there interested in

16 explosives?

17      A.     I guess there's -- there are a few, yes.

18 I don't know how many.

19      Q.     Now, Harlan's a very -- well, there are a

20 lot of coal mines in Harlan, right?

21      A.     Right. You'll have a lot of people who

22 have a background with explosives, or people -- or

23 with companies who use explosives, whether it be in

24 coal mining or road excavation, road construction.

25      Q.     Would you say that explosive are

1  relatively available in Harlan?

2      A.      No.

3      Q.      Okay.  What about trail cameras?  There

4  are a lot of people in Harlan interested in trail

5  cameras, right?

6      A.      I would say anywhere in rural Kentucky,

7  there's a lot of people interested in trail cameras.

8      Q.      A lot of people out on four-wheeler trails

9  putting them up, that kind of thing?

10     A.      Yeah.  I guess people interested in

11 hunting or protecting their property.

12     Q.      Okay.  Now, the property that you've

13 testified about here today where the trail cameras

14 were found, lots of people have access to that

15 property, right?

16     A.      The Bennett Family, and they gave access

17 to certain people.  That's my understand -- I don't

18 know how many.

19     Q.      Was there any sort of fence or barrier to

20 keep people out?

21     A.      I don't believe there was.

22     Q.      Any kind of no trespassing sign?

23     A.      I couldn't say.

24     Q.      Could anybody just walk onto this property

25 and likely not be detected?

1    A.    That's my understanding, yes.

2    Q.    Okay.  I want to talk to you about -- do

3 you still have the exhibits?

4    A.    I do.  They're right here.

5    Q.    Okay.  I'd like to refer you to Exhibit 3.

6 What kind of shell casing is that?

7    A.    From my notes, it is a Winchester .45.

8 Let me double-check.  Yes, spent nine -- or, sorry,

9 nine millimeter, not .45, spent nine millimeter brand

10 shell cases.

11    Q.    And a nine millimeter, that's not a

12 shotgun, right?

13    A.    That is not a shotgun.

14    Q.    Did you find a nine millimeter gun in

15 Mr. Sawaf's residence?

16    A.    I don't believe so.

17    Q.    Did you find any nine millimeter shells in

18 Mr. Sawaf's personal residence?

19    A.    I'm not sure.  I'm looking at the log.  I

20 know we found ammunition, but I don't believe we found

21 nine millimeter ammunition.

22    Q.    I'd like to refer you to Exhibit 8.

23 Remind us what that's a photograph of.

24    A.    That is a .410 shotgun shell.

25    Q.    Okay.  Is a .410 shotgun shell a different

1  kind of shell from a nine millimeter?

2      A.      It is.

3      Q.      Next Exhibit, Exhibit 9 what kind of

4  shell's that?

5      A.      Sorry.  I'm -- I must have got out of

6  order here.

7          MR. ROSSMAN:  That's fine.  Take your time.

8      A.      A .12 gauge.

9      Q.      Okay.  And is that different from a nine

10 millimeter shell?

11     A.      It is, yes.

12     Q.      Okay.  Did you find any .410 shotgun

13 shells or .12 gauge shotgun shells in any trail

14 cameras?

15     A.      In any trail cameras?

16     Q.      Yeah.  Out in the field.

17     A.      We've only found the one with the intact.

18     Q.      So is it safe to say that the explosive

19 device found as pictured in Exhibit 3, at least the

20 shell casing, does not match any item found in Sawaf's

21 residence?

22     A.      The shell casing?

23          MR. ROSSMAN:  Correct.

24     A.      The shell casing does not match.

25     Q.      Thank you.  Now, are you familiar with the

1  methods of marijuana grow operations in Harlan County

2  and the surrounding areas?

3      A.      Yes.

4      Q.      Is one of those methods the use of booby

5  traps?

6      A.      Yes.

7      Q.      Can you explain some of the booby traps

8  that you're familiar with that are commonly used in

9  marijuana grow operations in this area.

10     A.      Trip wires that will initiate signaling

11 flares.  That's been one of the more common ones.

12 We've seen some improvised devices.  I've had some

13 with fire crackers that would light fire crackers to

14 scare people off, again, trip wires.

15          We've had a couple that were destructive

16 devices, but those weren't in Harlan, a case that we

17 did in 20 -- or 2009, in Laurel County, and then one

18 in 2010 that was again, the fire crackers.  But I

19 haven't seen anything like this in -- on the trail

20 cams.

21     Q.      So is it accurate to say that marijuana

22 grow operations commonly use booby traps that are

23 designed to scare or injure people who might be in the

24 area?

25     A.      That's not fair.  It's very rare that we

find those.  I think every year the state police do
the eradication.  I haven't been called in any of the
last three years for any devices statewide, and I
would be the first one called.

Q.      How many devices have you been called for
in connection with the marijuana grow operation in
your career?

A.      Three.

Q.      Okay.  Any of those in Harlan?

A.      No.

Q.      Now, in the area where these trail cameras
were found in connection with this investigation, did
anyone search for a marijuana grow operation?

A.      Yes.

Q.      Describe the efforts that were undertaken
to search.

A.      ATF agents and Kentucky State Police, the
cannabis suppression units went out on ATVs and
searched the area following the discovery of this
device.  They did not find anything.

Q.      They did not find any indication of a
marijuana grow operation?

A.      Not in that area, not in that search, not
to my knowledge.

Q.      Now, the cameras that were found marked

with the initials "M.S.", is it true that anyone could
have had access to those while those were in the
field?

    A.      Sure.

    Q.      Okay.  And is it true that some of the
people you interviewed in your investigation did not
like Mr. Sawaf?

    A.      I think that would be fair to say.  They
didn't want him on the property.

    Q.      Would it be fair to say that some of them
had a grudge against him?

    A.      I never -- and this is stuff that's been
advised of me through reports -- I've never picked up
on that, that there was a grudge, but that -- I
couldn't say.

    Q.      How many cameras were seized from
Mr. Sawaf's personal residence?

    A.      Six.

    Q.      And did any of those have the initials
"M.S." marked on them?

    A.      I couldn't say.

    Q.      Were any of the items that you testified
about from the trash pull per se illegal?

    A.      No.  Illegal in and of themselves?

          MR. ROSSMAN:  Correct.

1      A.      No.

2      Q.      What about any items from the -- seized

3 pursuant to the execution of the search warrant?

4      A.      In and of themselves without, you know,

5 looking at it now with the drugs that we found.  We

6 did find drugs during the search warrant, so those

7 would be illegal, the suspected meth, the suspected

8 marijuana, and then when you combine that with the

9 firearms and the explosives, then yes, all of those

10 would be illegal.

11      Q.      Tell me about the drugs you found in the

12 investigation.  What did you find?

13      A.      A small amount of suspected

14 methamphetamine, and I believe marijuana and

15 paraphernalia.

16      Q.      How much marijuana?

17      A.      I couldn't say.  I think it's a small

18 amount.

19      Q.      Okay.  Was there any unexploded device

20 found in Mr. Sawaf's residence or his trash?

21      A.      Yes, two.

22      Q.      Okay.  And which were those?

23      A.      They were Exhibits -- Exhibit 8, Exhibit

24 9.

25      Q.      Those are the shotgun shells, right?

1    A.    Yes.  Those are unexploded destructive
2  devices.
3    Q.    None of these were placed inside of a
4  trail cam, correct?
5    A.    No.
6    Q.    Did you find any unexploded nine
7  millimeter shells that were explosive devices
8  consistent with Exhibit 3?
9    A.    No.
10    Q.    Did any of the exploded trail cameras or
11  unexploded trail cameras that had explosive devices in
12  them, did you find a note in any of those?
13    A.    No.
14    Q.    Would the note that you found referenced
15  in Exhibit -- I thought it was 5.  Maybe you can help
16  me.  Exhibit 7 --
17    A.    Uh-huh (affirmatively).
18    Q.    -- that says, "Broken camera for a broken
19  soul."  Would that note in your experience and
20  training have been consumed or destroyed in an
21  explosion or fire?
22    A.    Yes.
23    Q.    Did -- did your investigation reveal any
24  reason why somebody might put a note in an exploding
25  camera?

1    A.       In an exploding camera?  No.

2         MR. ROSSMAN:  Yes.

3    A.       The only information we have about the

4  note is from Mr. Sawaf about what he said about why he

5  would put it in the cameras to prank somebody, to

6  basically get a thief to take a broken camera, so

7  that's the only information we have.

8    Q.       Okay.  Now, we talked about receipts and

9  the warranty cards for some cameras that were found in

10  Mr. Sawaf's trash and in his residence, specifically

11  Exhibits 5 and Exhibit 6.  Can you remind us what

12  Exhibit 5 is?

13    A.       Exhibit 5 is warranty information card for

14  the Primos camera.

15    Q.       Were any of the trail cams seized from

16  Mr. Sawaf's residence a Primos trail cam consistent

17  with this card?

18    A.       I couldn't say, looking at this.  I just

19  see six trail cameras with no description.  That's in

20  custody right now, and I don't -- I don't have that in

21  front of me.

22    Q.       Same question for Exhibit 6?

23    A.       Same answer.

24    Q.       Okay.  So we have not eliminated the

25  possibility that these items match trail cameras that

1 were in his home?

2    A.     We have not.

3    Q.     Okay.  Was there anything -- other then a

4 the different shells used, was there anything

5 inconsistent about the modus operandi of the explosive

6 device or the explosions between the trail cameras

7 found in the field versus what was found in

8 Mr. Sawaf's home?

9    A.     Can you rephrase the question, or repeat

10 it.  I'm sorry.

11    Q.     Okay.  So you would agree with me that the

12 shell casing found in the unexploded camera was

13 different from the shells that you found in

14 Mr. Sawaf's home, right?

15    A.     Yes.

16    Q.     And that would be a difference in the

17 method of explosive device used, correct?

18    A.     It would be a slight difference.

19    Q.     Okay.  Slight difference?

20    A.     Yeah.

21    Q.     Were there any other differences in the

22 explosive devices found in the field and what was

23 occurring in Mr. Sawaf's home?

24    A.     In my opinion, they were all very similar.

25 The components that you had -- Mr. Sawaf had every

component in his house.  Whether it was assembled or
not, you have a destructive device that is basically
the main charge, the initiation charge already
assembled in the .12 gauge and in the .410, which
already had the hobby fuse in it, very similar.  So
now all he's got to do is put it in with now we see
the orange wire that we have in his house.  He's got
all the components.  He's got the hobby fuse.  He's
got the trail cameras that he's taken apart.  To me it
looked like a manufacturing place for making these
IEDs.  That's -- it looked very similar.

Q.     So would the specific answer to my
question be, "No, there was no other difference
between what was found in the field and what was --
what he -- what he had in his home, the materials and
the makeup of the devices?"

A.     They were -- they were extremely similar.

Q.     Okay.  Did you investigate anybody else
for this?

A.     Yes.

Q.     And what was the result of those
investigations?

A.     We looked at the victim as being a person
who had made these devices.  We looked at Mr. Noe as
the person who gave him the devices, and our best

1  evidence led us toward Mr. Sawaf.  So we just --

2  basically, we followed where the evidence leads us.

3  We didn't have Mr. Sawaf in our cross hairs, even

4  within days after we had talked to Mr. Hall.  It

5  didn't turn up until days later that we started

6  getting information that led us to Mr. Sawaf.  So we

7  did investigate the victim, everybody that had the

8  trail camera, the victim's families, other people in

9  the area.  It was a very thorough investigation.

10      Q.      Okay.  And did you develop any information

11  that we've not already discussed here today that

12  indicated that somebody other than Mr. Sawaf did this?

13      A.      We have not.

14      Q.      Okay.  Now, final line of questioning.  We

15  talked about ARC finding some threatening materials,

16  correct?

17      A.      Yes.

18      Q.      Did they ever find a bomb?

19      A.      No.

20      Q.      Did they find an explosive device?

21      A.      No.

22      Q.      And they're a competitor of Mr. Sawaf,

23  correct?

24      A.      They are.

25      Q.      And so they would have an incentive to

discredit him, correct?

A.      Sure.

        MR. ROSSMAN:  That's all I have, Your Honor.

        THE COURT:  All right.  Mr. Trimble, your
redirect?

                    REDIRECT EXAMINATION

    BY:  MR. TRIMBLE:

    Q.      Agent Tremaine, only a couple of more
questions.

        Are you -- Mr. Sawaf admitted during his
statement to ATF personnel that he did own a nine
millimeter pistol; is that correct?

    A.      That's my understanding.

    Q.      And there were several questions asked
about the different shells that were involved, and I
think you touched on this, but when you were talking
about the similarities, is that about the method of
construction?

    A.      Yes.

    Q.      The method of construction with what we
found in the device, the intact device found at
Mr. Hall's residence and the components that we found
to include the intact destructive devices at
Mr. Sawaf's home were extremely similar.  And, I mean,
the orange wire, the green hobby fuse, it's all just

extremely, extremely similar.  These are item -- it's
my guess that the orange wire is identical to the
orange wire -- the orange wire that was found in
Mr. Sawaf's house is absolutely identical to the
orange wire that was found in the destructive device
at Mr. Hall's residence.

MR. TRIMBLE:  I don't have anything further.

THE COURT:  All right.  Recross, Mr. Rossman?

MR. ROSSMAN:  No, Your Honor.

THE COURT:  Agent Tremaine, can you tell me a
little bit more about the circumstances of the trash
pull.  Specifically, why don't you start with, if you
know, where the trash was actually found in relation
to the residence.

THE WITNESS:  It was pulled curbside nearest
the road.

THE COURT:  Okay.

THE WITNESS:  It appeared to have been
pulled -- pushed to the road and abandoned by
Mr. Sawaf for trash pick-up.

THE COURT:  Do you know how many -- well, was
the trash contained in bags?

THE WITNESS:  It was in a trash can, I
believe, Your Honor, but I -- I can't say a hundred
percent.

```
 1          THE COURT:  Okay.  Do you happen to know if
 2  along with items that you've described that were found
 3  in the trash pull there were any items indicating
 4  ownership of those materials, anything that would
 5  relate them to a particular individual?
 6          THE WITNESS:  There was a magazine that was
 7  found in the trash --
 8          THE COURT:  Uh-huh.
 9          THE WITNESS:  -- that was addressed to
10  Mr. Sawaf, but that was the only thing in the trash
11  that would have anything with his name on it.
12          THE COURT:  And that was found in the same
13  trash as the other items you described today?
14          THE WITNESS:  Yes, Your Honor.
15          THE COURT:  Okay.  Do either counsel have
16  follow-up questions?  Mr. Trimble?
17          MR. TRIMBLE:  No, Your Honor.
18          THE COURT:  Okay.  Mr. Rossman?
19          MR. ROSSMAN:  Just briefly.
20          THE COURT:  Sure.  Go ahead.
21                      RECROSS-EXAMINATION
22  BY:  MR. ROSSMAN:
23  Q.      What was the date of the trash pull?
24  A.      The trash pull was June 16th.
25  Q.      And are you aware of whether Mr. Sawaf
```

took an out-of-state trip in June?

A.    I'm not aware.  What I should add, though, I think there was a local police officer who had alerted ATF that Mr. Sawaf appeared to be cleaning out his house and was pushing trash to the road.  Whether he was leaving or not, it appeared to this officer that Mr. Sawaf was pushing trash to the road and cleaning out his house.

Q.    Did you have his home under surveillance during this time period?

A.    Not -- not under surveillance, but the local police departments were keeping eyes on him, not, like, sitting in the car watching him, but, you know, people in the neighborhood, if officers drove by, officers involved in the case, if they noticed things, they would let us know, and they did.

Q.    And did you develop any information that he was gone in June?

A.    I -- I can't say that.  I don't -- I didn't.

MR. ROSSMAN:  Okay.

THE COURT:  Okay.  Special Agent Tremaine, you can step down.  Further evidence on behalf of the United States, Mr. Trimble?

MR. TRIMBLE:  Your Honor, with the -- with

the exception of argument to be made by the United

States --

    THE COURT:  Right.

    MR. TRIMBLE:  -- the United States has no

further witnesses to call in its proof.

    THE COURT:  Okay.  Mr. Rossman, how do you

prefer to proceed?

    If you were to call both witnesses, how long

do you think their testimony would take?

    MR. ROSSMAN:  I'll try to be very brief.  I

think I could do each one in under ten minutes on

direct.

    THE COURT:  Well, I don't want to -- I don't

want to inconvenience them unnecessarily; I don't want

to hamstring you either, but I'm fine to proceed --

Sheila, are you okay schedule-wise?

    DEPUTY CLERK:  Yes, sir.

    THE COURT:  All right.  Mr. Trimble, do you

have any objection to trying to complete the hearing?

    MR. TRIMBLE:  I've got no objection.

    THE COURT:  Okay.  Mr. Rossman, call your

first witness, please.

    MR. ROSSMAN:  Call John Sawaf.

    THE COURT:  John Sawaf?

    MR. ROSSMAN:  Yes.

```
 1              THE COURT:  We'll get John Sawaf in the
 2   courtroom.
 3              DEPUTY CLERK:  The exhibits?
 4              THE COURT:  Oh, yeah.  The originals were
 5   left -- okay.
 6              DEPUTY CLERK:  I've got them.
 7              [THE WITNESS JOHN NAMIR SAWAF WAS SWORN]
 8              THE COURT:  State your full name, please,
 9   sir.
10              THE WITNESS:  John Namir Sawaf.
11              THE COURT:  Spell the middle and last names,
12   please.
13              THE WITNESS:  N-A-M-I-R S-A-W-A-F.
14              THE COURT:  Okay.  You'll be asked several
15   questions by the lawyers today, and possibly by me.
16   Speak up, speak clearly into the microphone in
17   response.  The chair doesn't move.  The microphone
18   will slide closer to you if you want it to do that.
19   There's some water there, if you need it.
20              If you're asked about any residential
21   addresses, try not to reveal the street number.
22              And if you're asked about any minors, try not
23   to reveal their names.
24              If you do either one of those things we'll
25   clean it up, so don't worry about it too much.
```

1    THE WITNESS:  Okay.

2    THE COURT:  Go ahead, Mr. Rossman.

3    MR. ROSSMAN:  Thank you, Your Honor.

4                    Defendant's Proof

5                 DIRECT EXAMINATION

6    BY:  MR. ROSSMAN:

7    Q.    Good afternoon.  I'm Travis Rossman.  I

8 represent Mark Sawaf.  I'd like to ask you some

9 questions.  Could you tell us your relationship to

10 Mark Sawaf.

11    A.    I'm his brother.

12    Q.    Okay.  And have you known him all of his

13 life?

14    A.    Yes.  I've known him all my life.

15    Q.    Okay.  Could you tell us a little bit

16 about your relationship with him.

17    A.    Well, you know, we see each other, you

18 know, when we're, you know, together, you know,

19 usually when we go to, you know, Lexington, me and my

20 wife and family.  Last time, you know -- you know, he

21 came to my birthday and, you know, we usually have

22 dinner, things like that.  So, um, you know, now --

23 it's -- we don't really get to spend a lot of time as

24 we used to.  He works and I work, so -- and I have a

25 family and ...

1      Q.      Okay.  And could you tell us how you're

2  employed, sir.

3      A.      I'm a physician.

4      Q.      Okay.  And what's the city and state where

5  you live and work?

6      A.      I work in Johnson City, Tennessee.

7      Q.      Okay.  Could you tell us a little bit -- I

8  want to talk to you about Mark's history and

9  characteristics.  Could you tell us a little bit about

10 his physical and mental condition?

11     A.      Yeah.  He -- he's healthy.  He doesn't

12 have any mental conditions that I'm aware of, and

13 he's, you -- you know, a perfectly healthy person.

14     Q.      Has he ever shown any signs of depression

15 to you?

16     A.      No.

17     Q.      Have you ever noticed any sort of

18 substance abuse problem with him?

19     A.      No.

20     Q.      Have you seen him drink socially?

21     A.      Yes.

22     Q.      Does he ever drink to excess?

23     A.      No.

24     Q.      Have you ever seen him do marijuana or

25 methamphetamine?

1      A.      No.

2      Q.      When was the last time you were in his

3  residence?

4      A.      That was last August of 2015.  Our mother

5  passed away and it was her funeral.  I was at his

6  residence then.

7      Q.      Did you see any indication of substance

8  abuse taking place then?

9      A.      No.

10      Q.      Did you see any indication that he was

11  manufacturing explosive devices?

12      A.      No.

13      Q.      Have you noticed any sort of recent

14  deterioration in his mental condition?

15      A.      No.

16      Q.      Has he been behaving erratically or

17  sending you strange messages?

18      A.      No.

19      Q.      Would you say that he's kind of been

20  acting normally like he always does?

21      A.      Yes.

22      Q.      Okay.  Now, are you aware that he once had

23  ADHD, or has ADHD?

24      A.      Can you repeat the question?

25      Q.      Are you aware that he now has ADHD or once

1 had ADHD --

2     A.     No.

3     Q.     -- or was diagnosed?

4     A.     No.

5     Q.     Has he ever shown any kind of lapse in

6 concentration or any kind of problem that would

7 indicate to you that he has some kind of mental

8 problem?

9     A.     No.

10    Q.     Could you tell us a little bit about his

11 family ties to Kentucky.

12    A.     Well, he has -- his father lives in

13 Lexington.  His girlfriend Nancy lives in Lexington.

14 He has another brother that lives in Lexington.  And

15 he -- he has -- he works -- he has -- he works there

16 as a counselor.

17    Q.     Okay.  Does he split his time between

18 Lexington and Harlan?

19    A.     Yes.

20    Q.     And do you know how long he's done that?

21    A.     I would venture a guess, you know, at

22 least eight years or so, between --

23    Q.     Do you know how long he's lived in

24 Kentucky?

25    A.     Since, you know, for 15 years I would say,

1   16 years.

2       Q.      Okay.  Tell us about his -- his work

3   situation, what does he do for a living, and where he

4   works and what the nature of his work is.

5       A.      He works as a counselor, psychiatry.  He

6   works as a, well, you know, counselor as far as I ...

7       Q.      So in that line of work, does he help

8   people who have mental and emotional problems?

9       A.      Yes.

10      Q.      Okay.  Do you know if he has a criminal

11  history, a criminal past?

12      A.      No.

13      Q.      Okay.  Is there anything that you've

14  observed about him that would indicate that he's a

15  danger to the community?

16      A.      No.

17      Q.      Okay.  Is there anything else you want to

18  tell us about his presence in the community or whether

19  he would present any kind of threat?

20      A.      No.  I don't believe he would be a threat

21  to the community.  He's a -- he would be -- you know,

22  an -- he's -- he's an asset.  As a counselor, you

23  know, to -- his patients need him, and he would be

24  beneficial to continue his work as a counselor in the

25  community.

1    Q.    And -- and in his employment as a
2  counselor, his patients are counting on him, right?
3    A.    Yes, definitely.
4        MR. ROSSMAN:  All right.  I think that's all
5  I have of this witness, Your Honor.
6        THE COURT:  Okay.  Mr. Trimble, your cross,
7  sir.
8                    CROSS-EXAMINATION
9    BY:  MR. TRIMBLE:
10   Q.    Dr. Sawaf, I just have a few questions for
11 you.  You indicated you're a physician, correct?
12   A.    Yes.
13   Q.    What kind of physician are you; what type
14 of medicine do you practice?
15   A.    Hospitalist.
16   Q.    Do you -- are you a psychiatrist?
17   A.    No.
18   Q.    Are you licensed as a psychiatrist?
19   A.    No.
20   Q.    Are you licensed in substance abuse
21 counseling or treatment?
22   A.    No.
23   Q.    Have you ever conducted any formal
24 evaluation of your -- of Mark Sawaf's mental health?
25   A.    No.

1    Q.    Have you ever conducted any formal
2  evaluation of Mark Sawaf's substance abuse?
3    A.    No.
4    Q.    Are you aware that during the search of
5  his residence, ATF officers found methamphetamine?
6    A.    No.
7    Q.    Are you aware that during a search of his
8  residence, officers found marijuana?
9    A.    No.
10   Q.    You indicated that you live in Johnson
11 City, Tennessee.  You don't see him a lot of the time.
12 Can you give us an indication about how often you do
13 see him?
14   A.    You know, maybe every two, three months
15 when I'm in Lexington.  You know, sometimes, you know,
16 we'll have dinner, you know.  It's several months at a
17 time, but I would -- you know, that -- about, you
18 know, four or -- three or four months on average.
19   Q.    And how much do you know about destructive
20 devices?
21   A.    I don't know anything about destructive
22 devices.
23   Q.    Okay.  I've just got a couple of more
24 questions.
25       According to the bond report in this case,

the -- a KASPER check or around 2009, Mr. Sawaf was
prescribed Zoloft for a few months to treat depression
by Dr. Raza in Harlan, Kentucky.  Do you have any
reason to dispute that information?

     A.     No.

          MR. TRIMBLE:  I don't have anything further,
Your Honor.

          THE COURT:  All right.  Mr. Rossman,
redirect?

          MR. ROSSMAN:  Very briefly.

                    REDIRECT EXAMINATION

     BY:  MR. ROSSMAN:

     Q.     Other than face-to-face contact every two,
three months, what's the frequency of your other
contact with Mark Sawaf, such as phone conversations,
text messages, emails?

     A.     You know, we rarely -- you know, we're --
we're so busy with, you know, I have my work and
family, so we -- we don't really get to talk a lot, so
through the phone or texting, so usually --

     Q.     But you do see him face-to-face from time
to time?

     A.     Yeah.

     Q.     And recently during the last year, have
you noticed a change in his behavior?

1      A.      No.

2      Q.      In your experience as a hospitalist, do

3 you treat people who are involved in drug use?

4      A.      Yes.

5      Q.      And do you treat people who are -- have

6 mental problems or erratic behavior?

7      A.      Yes.  I just -- two people yesterday that

8 I'm treating that are psychiatry patients I'm trying

9 to get into psychiatry facilities, and so yeah, every

10 day I -- I'm basically doing that type of work.

11      Q.      Are you familiar with some of the signs

12 that people exhibit when they're having a mental

13 breakdown or some sort of major change in their

14 behavior?

15      A.      Yes.

16      Q.      What are those signs?

17      A.      You know, depression, anxiety, using

18 drugs, you know, thoughts of suicide and things

19 like -- of that nature.

20      Q.      Have you noticed any of those behaviors in

21 Mark Sawaf?

22      A.      No.

23           MR. ROSSMAN:  Thank you.

24           THE COURT:  Sir, when you said that you

25 visited the defendant at his residence following your

mother's death, which residence was that?

THE WITNESS:  Harlan -- Harlan, Kentucky.

THE COURT:  The residence in Harlan, Kentucky.  Okay.  Did -- you just described that you're familiar with symptoms of depression.  Did -- did the defendant seem depressed at that time?

THE WITNESS:  No.

THE COURT:  All right.  Do other counsel have follow-up questions?

MR. TRIMBLE:  No, Your Honor.

MR. ROSSMAN:  No, Your Honor.

THE COURT:  Okay.  You can step down, sir. You can remain in the courtroom if you want to watch the rest of the hearing.

THE WITNESS:  Okay.

THE COURT:  Your next witness, Mr. Rossman?

MR. ROSSMAN:  Your Honor, our final witness will be Nancy Penn.

THE COURT:  Okay.  We'll get Ms. Penn into the courtroom, please.

[THE WITNESS NANCY BYRD PENN WAS SWORN]

THE COURT:  There you go.

THE WITNESS:  Okay.

THE COURT:  State your full name for me, please.

THE WITNESS:  Nancy Byrd Penn.

THE COURT:  Spell that middle name, please.

THE WITNESS:  B-Y-R-D.

THE COURT:  And the last name as well, spell it.

THE WITNESS:  Penn, P-E-N-N.

THE COURT:  Okay.  You'll be asked several questions today by the lawyers, possibly by me as well.

THE WITNESS:  Okay.

THE COURT:  You're doing a good job.  Speak up, speak clearly into that microphone.  The chair doesn't move.

THE WITNESS:  Oh.

THE COURT:  The microphone will slide --

THE WITNESS:  Okay.

THE COURT:  -- if you want to move that a little closer to you.

THE WITNESS:  Okay.  Is that good?

THE COURT:  Go ahead.

THE WITNESS:  Oh.  Sorry.  Can you guys hear me okay?

THE COURT:  Yes.  Yes.  If you're asked about any addresses, try not to reveal the street number.

If you're asked about any minors, try not to

reveal their names.

If either one of those things happens, don't worry about it too much.

THE WITNESS:  Okay.

THE COURT:  Okay.  Go ahead Mr. Rossman.

MR. ROSSMAN:  Thank you, Your Honor.

DIRECT EXAMINATION

BY:  MR. ROSSMAN:

Q.     Good afternoon.  I'm Travis Rossman.  I represent Mark Sawaf.

Could you tell us a little bit about your relationship with Mark Sawaf.

A.     We've been dating for nine years.  He's been amazing.

MR. ROSSMAN:  Okay.

A.     I can't -- I don't even -- I don't think there's nothing bad I could ever say about him.  He's perfect in every way.  He's been the best boyfriend.

Q.     Okay.  And could you split time -- or does he split time between your residence in Lexington and his residence in Harlan?

A.     Yes.  Usually he just comes on the weekends since he works during the week in Harlan.

Q.     And on the weekends, do you all live together?

1     A.    Yes.

2     Q.    And have you traveled extensively

3 together, or traveled some together?

4     A.    Yes.

5     Q.    Okay.  Have you noticed any substance

6 abuse problems from Mr. Sawaf?

7     A.    No.

8     Q.    Is he a social drinker, would you say?

9     A.    I'd say, yeah, but --

10    Q.    Okay.  Have you ever seen him excessively

11 drunk or anything like that?

12    A.    No.

13    Q.    Have you ever seen him high on marijuana?

14    A.    No.

15    Q.    Have you ever seen him smoke marijuana?

16    A.    No.

17    Q.    Have you ever seen him use meth?

18    A.    No.

19    Q.    Have you ever seen him high on meth?

20    A.    No.

21    Q.    Any other drugs?

22    A.    No.

23    Q.    Okay.  Have you ever seen any kind of

24 erratic behavior or indication of mental or emotional

25 distress from Mr. Sawaf?

1    A.    No, never.

2    Q.    How often do you go to the Harlan

3 residence?

4    A.    Um, I've been there maybe, like, four or

5 five times in the last nine years.  And --

6    Q.    When was the last time you were there?

7    A.    I don't remember the exact date.  It was

8 when his mother passed away.

9    Q.    Okay.  Did you see any marijuana?

10    A.    No.

11    Q.    Did you see any meth?

12    A.    No.

13    Q.    Did you see any explosives?

14    A.    No.

15    Q.    What about the Lexington residence where

16 you live, is there any marijuana?

17    A.    No.

18    Q.    Meth?

19    A.    No.

20    Q.    Explosives.

21    A.    No.

22    Q.    Okay.  Now, do you have any -- are you a

23 prior convicted felon?

24    A.    No.

25    Q.    If the Court were to allow it, would agree

to take custody of Mr. Sawaf, report any violation of

his conditions of supervised -- or of conditions of

release immediately and realize that you could be

punished for a failure to do so by contempt and being

jailed up to 179 days?

A.     Yes.  I understand.

Q.     Okay.  And you would be willing to do

that?

A.     Yes, I would.

Q.     Okay.  Tell us a little bit about

Mr. Sawaf's employment.

A.     Um, he mostly does substance abuse

counseling.  He works in Harlan, so there's a lot of,

you know, drug use, and he just mostly just wants to

help the people who are addicts and just treat them.

Um, he just loves helping people, and he's really

open-minded, and he is just amazing.  He's a great

counselor.

Q.     Does he have patients in Lexington too?

A.     Yes.

Q.     And does he work there on the weekends

some?

A.     Yes.

Q.     Okay.  And are his patients counting on

him?

1       A.      Oh, yeah.

2       Q.      Have you met some of them?

3       A.      I've never met any of them.

4       Q.      Okay.  Is there anything about him that

5  you think makes him a danger to the community?

6       A.      No, nothing.

7              MR. ROSSMAN:  I think that's all I have for

8  this witness, Your Honor.

9              THE COURT:  Okay.  Mr. Trimble, your cross,

10 please.

11                     CROSS-EXAMINATION

12      BY:  MR. TRIMBLE:

13      Q.      Ms. Penn, have you ever observed Mr. Sawaf

14 in possession of marijuana?

15      A.      No.

16      Q.      And you told Mr. Rossman that you've never

17 seen him use marijuana before?

18      A.      I have never seen him use it.  I don't --

19 I really don't recall, but I don't really know.

20      Q.      Have you -- do you recall making a

21 statement to ATF officials?

22      A.      Yes.

23      Q.      Did you tell them that you had seen him

24 use marijuana in the past?

25      A.      Um, in Cabo, like California, I mean, he's

used it there.  But, like, I really didn't see him do it.

Q.      So are you aware that in the past that he has used marijuana?

A.      Yes.

Q.      Have you ever seen Mr. Sawaf mix an explosive mixture?

A.      No.

Q.      Have you ever seen him mix any powders at all?

A.      No.

Q.      Did you -- do you remember speaking with Alcohol Tobacco and Firearms officers?

A.      Yes.

Q.      Did you indicate to those officers that you had seen him mix any sort of powders?

A.      I've never seen him mix anything.

Q.      Okay.  And how much information do you know about destructive devices, if anything?

A.      I don't really know anything about it at all, so I know nothing really.

Q.      Have you ever heard Mr. Sawaf say anything about trail cameras?

A.      Um, I've heard him mention 'em, but, I mean, I've never seen them before, but yeah, I mean,

1  it's for hunting, so ...

2      Q.      What do you -- what do you remember

3  Mr. Sawaf saying about trail cameras?

4      A.      He just uses them to see deer, where deer

5  are.

6          He did mention one time that they had been

7  stolen, but, I mean, it wasn't a big deal to him.

8      Q.      Did he say that he wanted to do anything

9  as a result of them having been stolen?

10     A.      No, not like -- no, nothing about that.

11 Like he's kind of like he wants to be a comedian; he's

12 kind of a jokester, but he would never do anything to

13 harm anybody.  Or he's never said, Oh, I'm going to do

14 this to a person directly.

15         Like, if -- for example, like Steve

16 (unintelligible), whatever, he just may saw that maybe

17 on, like, Jackass or You Tube, but never said.  He's

18 not going to do that to anybody.  It's just ...

19     Q.      Have you -- have you ever heard him

20 indicate that he would like to play a practical joke

21 involving a trail camera?

22     A.      No.

23     Q.      Okay.  He didn't -- okay.  Let me ask you

24 a question concerning your -- the line of questioning

25 regarding third-party custodian status.  Are you --

are you employed, Ms. Penn?

A.      Yes.

Q.      And how are you employed?

A.      Well, I have two jobs.  One of 'em is self-employed.  I have a shop on Etsy.  It's a site where you make handmade items, or vintage.  So pretty much I just reconstruct high-wasted shorts, just cut them, do custom, just whatever the girls want, and sell them online all over the world, so -- I do that all at home.

And also I have a retail job at Pac Sun in Fayette Mall, so I usually just work there Fridays or Saturdays, just depending.  It's just part-time, so ...

Q.      And -- and how frequently do you do that, the job at the mall?

A.      Usually -- like lately, like once or twice a week.  Usually Friday and Saturday.

Q.      Are the bills attached to the residence that you live in Lexington, do you pay those bills from the revenue that you get from the jobs that you've mentioned?

A.      Um, you mean to, like, our house?  No.

Q.      How are those -- how are those bills paid?

A.      By Mark.

1    Q.    And are you willing to forgo your job at

2 Pac Sun to serve as third-party custodian?

3    A.    Yes, because it's just part-time.

4    Q.    And you mentioned that Mark is planning

5 to -- Mark pays the bills for that residence.  How are

6 those bills going to be paid during Mr. Sawaf's

7 incarceration?

8    A.    I plan on finding a full-time job,

9 something that would work with my at-home job, you

10 know, on Etsy, so ...

11    Q.    Do you -- do you have a current prospect

12 on a home full-time job?

13    A.    Not currently.

14    Q.    Now, you mentioned -- you said a lot of

15 really nice things about Mr. Sawaf at the very

16 beginning.  It's clear that you think really high of

17 him.  You don't want to see anything bad happen to

18 Mr. Sawaf; is that right?

19    A.    No.

20    Q.    And you think very highly --

21    A.    Yes.

22    Q.    -- of Mr. Sawaf?  Do you think if -- if

23 you were to see him do something that was illegal,

24 that you would be able to report that to his probation

25 officer?

1    A.    Yes, I would, without a problem.

2    Q.    Even if -- even if that meant that he

3 would have to go to jail?

4    A.    No.  I would still report it.

5         MR. TRIMBLE:  All right.  I don't have any

6 further questions, Your Honor.

7         THE COURT:  Mr. Rossman?

8         MR. ROSSMAN:  Nothing, Your Honor.

9         THE COURT:  All right.  Officer Pruitt, can I

10 see the -- if you have the form, order conditions of

11 release.

12         So, Mr. Rossman, this witness is being -- is

13 going to be offered as a third-party custodian; is

14 that correct?

15         MR. ROSSMAN:  That's correct, Your Honor.

16         THE COURT:  All right.  I have a few

17 questions for you about that, ma'am.

18         THE WITNESS:  Okay.

19         THE COURT:  You can be seated, Mr. Rossman.

20         MR. ROSSMAN:  Thank you.

21         THE COURT:  Do you have any criminal record

22 whatsoever, ma'am?

23         THE WITNESS:  No.

24         THE COURT:  Do you have any traffic tickets,

25 anything like that?

1          THE WITNESS:  I've had two traffic tickets

2    for speeding, which I went to driver school -- well,

3    online driver's school.

4          THE COURT:  Okay.  Could you tell me how far

5    you made it in your education, ma'am?

6          THE WITNESS:  I have a bachelor's degree from

7    University of Kentucky in merchandising.

8          THE COURT:  Okay.  And when did you earn

9    that?

10          THE WITNESS:  December of 2010.

11          THE COURT:  All right.  Now, what -- what --

12    well, are you being treated by a psychiatrist or a

13    mental health professional for any reason at this

14    time?

15          THE WITNESS:  Yes, I am.

16          THE COURT:  Okay.  What are you being treated

17    for, ma'am?

18          THE WITNESS:  Bipolar disorder, panic

19    disorder, anxiety disorder and ADHD.

20          THE COURT:  Okay.  I'm sorry you suffer from

21    those conditions.

22          How long have you struggled with those,

23    ma'am?

24          THE WITNESS:  Basically all my life, but I

25    was diagnosed with bipolar at 22.

1          THE COURT:  Yes.

2          THE WITNESS:  What'd you say?

3          THE COURT:  I said "yes."  Go ahead.

4          THE WITNESS:  Okay.  Panic disorder, I don't

5    recall the exact year.  I'd say, like, seven years ago

6    --

7          THE COURT:  Okay.

8          THE WITNESS:  -- but, I mean, I don't know

9    exact dates.  But I've always just had problems with

10   mental health, so ...

11         THE COURT:  How often are you treated for

12   those mental health problems, ma'am?

13         THE WITNESS:  I go to a psychiatrist -- well,

14   she's a nurse practitioner.

15         THE COURT:  Yes.

16         THE WITNESS:  So I go every two months for an

17   appointment for -- to see her, and I'm prescribed

18   medication for all three mental health conditions.

19         THE COURT:  Okay.  Have you ever been

20   hospitalized in connection with any of your mental

21   health conditions?

22         THE WITNESS:  I have once for three days for

23   depression.

24         THE COURT:  Okay.  When was that, ma'am?

25         THE WITNESS:  When was that?

1          THE COURT:  Approximately.

2          THE WITNESS:  It was -- I believe it was in

3  2010, because it was -- yeah, it was during the summer

4  when I didn't have a job, because my -- my former job

5  at the time, the business closed, so I didn't have a

6  job --

7          THE COURT:  Okay.

8          THE WITNESS:  -- and that's how I recall the

9  date.

10         THE COURT:  Your online business closed?

11         THE WITNESS:  Oh, no.  This was in, like,

12  2010.  I didn't have my online business then.

13         THE COURT:  Okay.  Now, what Mr. Rossman is

14  talking about is that you would be under a court order

15  to be Mr. Sawaf's custodian if he's released.  Do you

16  understand that?

17         THE WITNESS:  Yes.

18         THE COURT:  That means you would be

19  responsible for supervising him 24 hours a day.  Do

20  you understand that?

21         THE WITNESS:  Yes, I do.

22         THE COURT:  Do you have any commitments other

23  than this part-time job that take you outside your

24  home on a regular basis?

25         THE WITNESS:  Just -- just to have, like, a

1  doctor appointment or so.  I mean, I really don't have

2  anything else to do that's really important.  Other

3  than I do need to be able to restock, like go to

4  Goodwill.  But, I mean, I can always try to hire

5  somebody to do -- to help me out.

6          THE COURT:  But you have to run errands,

7  correct?

8          THE WITNESS:  Yes, but ...

9          THE COURT:  Like any normal person, you have

10  to run to the grocery store?

11          THE WITNESS:  Yes.  But if you -- I'm not --

12  if I need to be with him 24/7, I can figure out a way

13  to take care of that.

14          THE COURT:  Okay.  Now, you would be under

15  court order to supervise the defendant.  Do you

16  understand that?

17          THE WITNESS:  Yes.

18          THE COURT:  You'd be under a court order to

19  use every effort to assure his appearance in court at

20  all court proceedings.  Do you understand that?

21          THE WITNESS:  Yes.

22          THE COURT:  And then finally, you'd be under

23  court order to notify the Court immediately if the

24  defendant violates the condition of release or is no

25  longer in your custody.

1    If he's out of your custody for five seconds,
2 you have to call probation and report that.  Do you
3 understand that?
4         THE WITNESS:  Yes.  I do understand.
5         THE COURT:  And the likely result of
6 reporting a violation is an arrest warrant will be
7 issued and Mr. Sawaf would be taken into custody, and
8 could stay in custody for, given the status of this
9 case, several months.  Do you understand that?
10        THE WITNESS:  Yes, I do.
11        THE COURT:  Do you think that if he were to
12 leave your custody, you actually could take action
13 that would result in him being incarcerated, ma'am?
14        THE WITNESS:  Yes, I do understand.
15        THE COURT:  All right.  Now, as an additional
16 part of this responsibility you'd be taking on, if
17 Mr. Sawaf violated the conditions of release, you
18 could be held in contempt.  Do you understand that --
19        THE WITNESS:  Yes, I do, Your Honor.
20        THE COURT:  -- under certain circumstances?
21 And that could include up to six months imprisonment
22 for you, I think it's a $250,000 fine.  Are you
23 willing to subject yourself to those potential
24 penalties based on Mr. Sawaf's compliance with
25 conditions of release?

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  All right.  You'd also have to

3    allow probation to do a full background check on you

4    and visit your home.  Would you be willing to allow

5    for that, ma'am?

6          THE WITNESS:  Yes, Your Honor.

7          THE COURT:  All right.  Do either counsel

8    have follow-up questions?  Mr. Trimble?

9          MR. TRIMBLE:  No, Your Honor.

10          THE COURT:  Mr. Rossman?

11          MR. ROSSMAN:  No, Your Honor.

12          THE COURT:  You can step down, ma'am.  You

13    can stay in the courtroom if you want to watch the

14    rest of the hearing.  Okay.

15          Mr. Rossman, further evidence on behalf of

16    the defendant, sir?

17          MR. ROSSMAN:  No further evidence, Your

18    Honor.  We would rest, subject to proposing conditions

19    and (unintelligible).

20          THE COURT:  Okay.  Your -- I assume both

21    sides are going to be relying on the bond report, so

22    do we have sort of mutual agreement to adopt that by

23    proffer, Mr. Trimble?

24          MR. TRIMBLE:  I'll make that motion, and I

25    agree to -- to allow the -- to rely on that bond

report --

   THE COURT:  Okay.

   MR. TRIMBLE:  -- without calling the probation officer.

   THE COURT:  Mr. Rossman?

   MR. ROSSMAN:  We would agree, Your Honor, with one minor caveat.

   THE COURT:  Yes.

   MR. ROSSMAN:  That being that if he is released, he would not return to his residence in Harlan.  He would go to Lexington obviously to the residence with Ms. Penn.

   THE COURT:  Okay.

   MR. ROSSMAN:  And he would agree not to go to Harlan at all, subject to whatever may be required for a court appearance there for another case that we became aware of today.

   THE COURT:  Okay.  By way of the addendum, you mean?

   MR. ROSSMAN:  Yes, Your Honor.

   THE COURT:  Okay.

   MR. ROSSMAN:  The taking of the bear case.

   THE COURT:  Okay.

   MR. ROSSMAN:  He has a court date, I believe, July 25th.

THE COURT:  Okay.  Well, we can hear argument
now, we can reconvene, whatever you all prefer.  It's
late in the day, but I'm flexible.  Unless courthouse
staff have any scheduling problems, we can wrap it up
today.  It doesn't really matter.

Mr. Trimble, how do you want to proceed?

MR. TRIMBLE:  Your Honor, I don't plan to
regurgitate all of the evidence that was brought into
the record.  I have some summary comments, and can do
so quickly.  I have no objection to completing now.

THE COURT:  Sheila, is your schedule all
right?

DEPUTY CLERK:  I'm okay, Judge.

THE COURT:  Okay.  Go ahead, Mr. Trimble.

MR. TRIMBLE:  Your Honor, the United States
is moving for detention based on the danger posed by
Mr. Sawaf.  Danger, in addition to being one of the
grounds for moving for detention, is also one of the
factors the nature and seriousness of the danger.

And danger is present in this case in a -- in
a manner that is unusual in federal court.  We see a
lot of drug cases and possession of firearm danger,
but -- possession of firearm cases, and there are
danger in those cases, and we often say.  But in many
cases, that is prospective danger that could happen to

the community, or danger that is happening sort of
generally as a general harm to the community.

Here, we have destructive devices. Agent
Tremaine has indicated several of the devices that
we've referenced in this case are destructive devices.
They are capable of exploding. And they, as Agent
Tremaine has said, they're weapons with no purpose
other than to hurt someone. And in fact, in this
case, someone has been hurt.

Mr. Hall put a battery into victim-activated
device that caused significant damage that's been
shown to the Court to his hand and also damage to his
torso and in other places.

There was a second device that was found in
close proximity, which could have caused danger, was
outfitted similarly.

Now, we've gone through evidence, and I won't
belabor that to the Court, of several things that show
that Mr. Sawaf had a connection to these devices, and
also that there was at his home component parts to
make -- to make the destructive devices, including
two -- two devices that were identified by Agent
Tremaine as being destructive devices with no other
purpose than to serve as a weapon that could cause
harm, and additionally, enough explosive powder to do

significant danger.

Importantly, the materials to make a number of things that were found in his home were delivered to Mr. Sawaf through online purchases, and he appears to have assembled these devices, at least he has workstations and the component parts to be assembled at his home.

I mean, this presents a significant danger to the community, and a significant danger that is really not remediated in any way through home incarceration because these activities could take place in a home detention setting. This weighs heavily under the factors of the nature and seriousness of the offense.

Additionally, it weighs heavily -- the same facts are -- also relate strongly to the nature and circumstances of the offense. I mean, the charges in this case are under the National Firearms Act. We don't often think of tax law as being too -- as being too dangerous, but in *United States V. Springer* located at 609 F.3d 885; it's pin cited at 888, Sixth Circuit 2010, the Sixth Circuit notes that the Act's purpose is to curb the proliferation -- the National Firearms Act's purpose is to curb proliferation of especially dangerous weapons identified generally and broadly, if not exclusively, with criminal activity.

And that is the -- that's the type of devices that are found both in the possession of Mr. Sawaf's home and in the trail camera that is -- that is connected through substantial evidence, clear and convincing evidence, to Mr. Sawaf.

Let me address additionally the proof that was put in in this case in favor of Mr. Sawaf's release.

First, I would note that Dr. Sawaf appears to like his brother as some, but not all brothers do, and he is a physician. But -- but importantly, he's not -- he has not engaged, and he admitted he had not engaged, in any kind of formal evaluation of the substance abuse history of his brother or any kind of psychological evaluation of his brother, even if he was licensed to do so.

In fact, Dr. Sawaf, though is admirable to speak on behalf of his brother, sees him very infrequently by his own mention, and not just in face-to-face mentions, but also in his -- in his -- in his discussions, communication with him. He says he's got a family. He's busy as we all get. He doesn't have very much time to talk to him.

And so with respect to his -- to his willingness to testify on behalf of his brother, his

evaluation of him has to be considered within that
context.

Ms. Penn also admirably testified on behalf
of Mr. Sawaf and is willing to sacrificially serve as
a third-party custodian.  But for several reasons,
Ms. Penn is -- is really unable to fulfill -- to
fulfill that -- to fulfill that role.

She's mentioned that she has numerous medical
appointments, she has numerous errands to run, that
she has a job currently, that, although is willing to
forgo that, it takes her outside of the home.

She has bills to pay, which she plans to pay
through the full-time work through online employment
which she has not currently attained and has no
prospects of attaining, which leaves in doubt the
ability to even maintain the residence, and if she was
able to, to be able to provide the kind of attention
that is required of a third-party custodian.

With the things that take her outside the
house, she informed the Court that she would figure
out a way to -- to do that.  And I don't question the
good intentions of that.  That's just not the kind
of -- the kind of plan and the kind of circumstances
that typically underline a third-party custodian.

Another very significant reason that Ms. Penn

would be -- would not be an appropriate third-party

custodian is she initially said in the line of

questioning that she was -- that essentially that he

didn't do or use any drugs, but later admitted that --

that she was aware that he did do -- had been -- had

used marijuana on a -- on a trip.  That severely

undercuts the credibility and the ability of the Court

to rely upon her representation that she would let the

Court know if -- or a probation officer know if he

violated the terms of his supervised release.

        I would note I'm not, like Dr. Sawaf, not a

psychiatrist, but there was some significant mental

health issues that she identified and that she has

several appointments for that could limit -- and when

we're looking at detention, we've looked, for example,

at Mr. Sawaf's mental health issues that are

documented in the bond report, and -- and so I think

those are fair to consider in terms of the analysis of

the third-party custodian.

        I would also note that -- that she said that

she has very little knowledge of explosive devices.

And as I've mentioned before, the -- as I've mentioned

before, Mr. Sawaf was able to order the components

that he needed online.  He was able to assemble them

at his home.  And so she mentions she's got an online

business, and so this would enable him to do anything
that he's currently done in his residence in her
residence.

THE COURT:  Was there evidence that anything
other than perhaps two trail cams were purchased
online?  I mean, when you say components, you sort of
...

MR. TRIMBLE:  Yes.  Yes.  There was evidence
that during his interview Mr. Sawaf indicated that
the -- some of the mixtures that he did, he'd ordered
some of the materials --

THE COURT:  Okay.

MR. TRIMBLE:  -- online.

I'll just finally note that -- that there are
some history and characteristics that factor in here.
They're detailed in the -- in the report.  Mr. Sawaf
is -- has some -- some mental health concerns, also
some drug use concerns as -- as a result of, you know,
finding some methamphetamine, a small amount, and some
marijuana in his home as well.

Now, more concerning, it is -- his statement
that the note was to put in a trail camera to sort of
surprise a thief.  The -- the -- and also the
harassing behavior with Addiction Recovery and his
sending of them materials there.

1        THE COURT:  None of that's been corroborated
2   by law enforcement in any way, correct?
3        MR. TRIMBLE:  That is correct, Your Honor,
4   and we haven't represented that it has been.
5        THE COURT:  Right.
6        MR. TRIMBLE:  It was just reported to us.
7   Although I would say that -- that we have been
8   provided substantial documentation, including formal
9   complaints had been filed to the licensure board,
10  including emails, including photographs, photographs
11  of all of the -- of the box that says Mark Sawaf and
12  the return label, photographs of the items that are
13  inside.  The complaint has, I think, a three-page
14  exhibit list that just documents by date the instances
15  of harassment that was reported by ARC that's been
16  filed with the Licensure Board.
17       So while law enforcement hasn't -- hasn't
18  gone and followed up and talked individually to all
19  the people who the harassment is alleged through, I
20  mean, there are -- there has been what I consider
21  substantial documentation that has been provided by
22  ARC that does support, and -- and I think it's fair to
23  say, corroborate some of the things that have been
24  said by the -- by the counsel.
25       Do you have a further question about that?

THE COURT:  No.

MR. TRIMBLE:  I would conclude by noting that -- that the devices at issue in this case are destructive devices.  They are victim-activated with no other purposes than to harm others.  That makes Mr. Sawaf dangerous.  And this evidence, which is significant, proves by clear and convincing evidence that there's no combination of conditions that reasonably assure the safety of the community in the event that the defendant is released.

THE COURT:  Okay.  All right.  Thank you, Mr. Trimble.

Sheila, did you notice the phones just went off?  Does that happen every night at 6?  Do we have any -- I have no idea.  I just want to make sure it's not causing a problem with the computer.

DEPUTY CLERK:  Well, it's recording.

THE COURT:  Okay.  Mr. Rossman, your argument in response, please.

MR. ROSSMAN:  Thank you, Your Honor.  First, I'd like to note the presumption doesn't apply in this case.  The United States bears the burden.

Mr. Sawaf's 39 years old.  He has no prior criminal conviction.  He's a licensed professional caregiver.  He's been in a position of trust.  And

that distinguishes him from the mine-run defendant who
comes before this Court, many of whom have extensive
criminal histories.  And so I think that if we look at
his history as a law-abiding citizen, I think that
sheds a lot of light on the lack of danger that he
would present to the community.

Now, turning to the statutory factors
concerning the nature of the offense charged,
certainly, it's a very serious offense involving the
use of an explosive.  We -- we don't seek to minimize
that in any way.  It's very clear that some people
have been injured, and that's a very terrible thing,
but our position is Mr. Sawaf didn't do it.  Not only
based on the presumption of innocence, but we believe
the evidence is circumstantial and limited.

We've heard some evidence to try to tie
Mr. Sawaf to -- to these events, but we've heard some
inconsistencies.  So the trail cameras were accessible
by anybody.  The ones in the field were marked "M.S."
The ones at his residence apparently were not.  The
explosive device recovered used a different shell from
the device that was supposedly found at his home.

We found explosive devices in the field in
trail cameras, but in his home, there was just a note.
So, I -- I think there's some inconsistencies in the

modus operandi that really bear on the weight of the
evidence and also the nature and circumstances of the
offense.

I would also point out that there's been no
allegation of any criminal wrongdoing in Lexington,
and that's where we propose that Mr. Sawaf be located,
and that could be a condition of any release.

There's no indication that he was assembling
any sort of device in Lexington.  Trail cams are not
used as commonly in Lexington as they are in Harlan.
Certainly, I think one would -- would probably stand
out in Lexington.  And so I think that's something
that the Court could take into consideration.
Concerning --

THE COURT:  If it stands -- if it stands out,
isn't it more likely to draw a hapless victim?

MR. ROSSMAN:  You know, if it stands out, I
think it's more likely to draw suspicion --

THE COURT:  All right.

MR. ROSSMAN:  -- and I -- I'll leave it at
that.

THE COURT:  Okay.  Go ahead.

MR. ROSSMAN:  Concerning substance abuse,
we've heard evidence that he's a social drinker.
There's no indication of any problem, no indication of

him falling-down drunk.

There's been some evidence of marijuana that -- a little bit of evidence was found in his home supposedly. There's been some testimony about what happened in Cabo. I would note Ms. Penn said she didn't see him smoke marijuana, but she knew it; perhaps someone told her --

THE COURT: Right.

MR. ROSSMAN: -- we don't know. And I'm hardly an expert in Mexican law, but I think that that is legal there.

Regardless, I don't think there's any indication that he has such a substance abuse problem that it would present a danger to the community. I don't think we've heard any evidence of that here.

The mental health history, I think, is really overblown. He had -- there's a disputed diagnosis of depression in 2009 --

THE COURT: Uh-huh.

MR. ROSSMAN: -- and then a diagnosis of ADHD. I don't think there's really any allegation that he committed an offense because he was depressed. I think that's kind of in the past. It's not severe. It's not uncommon. I think it's managed.

I think that there's no indication of erratic

behavior.  We've heard his brother testify.  He's
familiar with the signs of erratic behavior.  And even
though they've, you know, not had daily contact, he's
been around Mr. Sawaf at various stressful times, such
as the death of their mother, and he's not noticed
anything different.

I think that in response to some of the
points raised by the United States, just briefly, much
of John Sawaf's testimony was corroborated by
Ms. Penn, so I think we can give that a little more
credibility and weight than the United States
suggests.

Ms. Penn has stated that she can make
arrangements to be at home, and Mr. Sawaf could work
from his home; he could maintain employment.  He sees
patients in Lexington.  He would have a duty to help
these patients, at least if nothing else, to transfer
their files.  Some of them have very serious
conditions.  And if he were released, he could address
that in an orderly fashion and perhaps maintain a
source of income to where he could maintain the
household.

The information about mailing harassing stuff
to ARC, I think, is a red Herring.  He's not been
charged with any crime in connection with that

activity.

There was testimony that there was Arabic writing on a note that ARC received, but Mr. Sawaf doesn't speak Arabic and cannot write Arabic, so that could not have been him.

So with that said, I think that -- that we've really shown that he's not a danger to the community. And I think there is a set of conditions that could be imposed to where he could be released and the safety of the community could be assured, and those conditions include Nancy Penn assuming custody of him --

THE COURT: Uh-huh.

MR. ROSSMAN: -- maintaining employment, which he can do from home, and he has been doing from home in Lexington so he can help his patients and transferring files, if need be.

Restrictions on his place of abode and travel. No travel to Harlan, except for a court appearance in connection with the bear case, which is upcoming, and any further appearances.

No travel outside of Fayette County or perhaps even outside the home except court appearances or attorney meetings.

Avoid contact with victims and witnesses.

1        Report regularly to pretrial services.

2        Certainly, no possession of firearms or

3   destructive devices, and there's been no indication

4   that any of that occurred in Lexington.

5        No drugs or alcohol, and he could be subject

6   to random testing to make sure that he's complying

7   with that condition.

8        Various family members are willing to execute

9   a surety, if need be.  I think that Ms. Penn, his

10  father Ali is here and his brother John Sawaf would

11  all be willing to execute a surety bond if the Court

12  were to impose that condition.

13        And finally, GPS monitoring could ensure the

14  safety of the community.

15        THE COURT:  Okay.  Let me ask you,

16  Mr. Rossman.  I understand the position is that the

17  circumstantial evidence is not sufficient to tie

18  Mr. Sawaf to the physical evidence that was found, the

19  destructive devices that were found, so I understand

20  that's your argument.  But if he is sufficiently tied

21  in the Court's view, doesn't then that mean we have a

22  portrait painted by the bond report that is consistent

23  with your witnesses' testimony, and doesn't that mean,

24  though, that we have someone who is a master at hiding

25  how he truly behaves?

1          MR. ROSSMAN:  Well, I don't think he's a

2    master at hiding how he truly behaves.  He was

3    investigated for exploding targets; he was cleared.

4    He had, according to the government, he had these

5    materials throughout his home, even in the front yard.

6    He had an exploded flashlight in his front yard,

7    according to the government, so I don't think that

8    makes him a master at hiding anything.

9          In fact, if he were taking trail cameras out,

10   marking them with his initials and putting explosive

11   devices in them, I think that would give him an "F" in

12   hiding things.

13         THE COURT:  Well, but, I mean, from the

14   people that know him best, and -- I mean, it seems to

15   me that if your position is wrong that this evidence

16   doesn't sufficiently tie him in terms of identity,

17   then what we have is, as I say, the portrait painted

18   by the bond report, the personal relationships that

19   were described today, and he's been able to deceive

20   the people closest to him about his dangerous

21   propensities, what -- what conditions of release could

22   possibly address that risk that he could continue to

23   deceive in that manner?

24         MR. ROSSMAN:  Put him in Lexington.  Don't

25   let him leave Harlan County, because the evidence was

1 limited solely to Harlan County.

2 　　　　　THE COURT:  Uh-huh.

3 　　　　　MR. ROSSMAN:  Ms. Penn said that she had been

4 there maybe four or five times there ever.

5 　　　　　John Sawaf had been there last in August,

6 2015.  So admittedly, these people are not going to

7 his residence in Harlan regularly, but there's been no

8 evidence of any kind of wrongdoing in Lexington, so

9 let's put him there.

10 　　　　　THE COURT:  Okay.  All right.  Anything

11 further, Mr. Rossman?

12 　　　　　MR. ROSSMAN:  No, Your Honor.  That's it.

13 Thank you.

14 　　　　　THE COURT:  All right.  Thank you.

15 Mr. Trimble, it's your burden, so you get the last

16 word.

17 　　　　　MR. TRIMBLE:  Your Honor, I -- I would just

18 note one clarification, and maybe a comment more.

19 It's my understanding that Mr. Rossman is representing

20 that he -- that Mr. Sawaf and some of the witnesses

21 that --

22 　　　　　THE COURT:  Which Mr. Sawaf?

23 　　　　　MR. TRIMBLE:  -- does not have a --

24 　　　　　THE COURT:  Which Mr. Sawaf?

25 　　　　　MR. TRIMBLE:  Mr. Sawaf, the defendant.

1          THE COURT:  Okay.

2          MR. TRIMBLE:  -- does not use drugs.  And I

3   just want to clarify that the bond report indicates

4   that he took the Fifth on that.

5          THE COURT:  Right.

6          MR. TRIMBLE:  I don't know if that's --

7          THE COURT:  On anything other than marijuana

8   use, right?

9          MR. TRIMBLE:  Right.  And I think that's -- I

10  don't -- I just want to clarify.  I don't know if

11  that's additional proffered information or additional

12  evidence, but I -- I do want to clarify that.

13         And then I would just say in conclusion that

14  supporting Your Honor's questions about deceit by

15  Mr. Sawaf, there is corroborating information in the

16  record about that.  He told in his interview with law

17  enforcement that he had not sealed casings that had

18  explosive material in them.  Well, of course, they

19  found that during the search of his home.

20         He told law enforcement he had not put wicks

21  in explosive material, and law enforcement found wicks

22  inserted in capped-off casings with hot glue in his

23  home.

24         He also told law enforcement he hadn't been

25  using drugs, and those these drugs were found, of

course, in his home. I think that goes in support of
Your Honor's line of questioning.

And I just would say finally that though the
United States objects to the combination of conditions
and does not believe they are sufficient, the United
States would very strongly object to the allowance of
Mr. Sawaf to continue to see patients under these
circumstances. I don't know that I understood that
correctly, but if that is the proposal he continues to
work from home. I know there are some maybe
representation he could transfer the files or
something, but the United States would object to that
condition.

THE COURT: Okay. All right. Thank you,
Mr. Trimble.

Okay. Mr. Sawaf, as I explained to you at
your initial appearance, when evidence is contested at
a detention hearing like this, typically, I can't make
a decision at the time of the hearing, and obviously,
there's been a lot of information presented today. I
need to take time to fully consider what's been
presented. I'll get my decision out as promptly as I
can.

The law does require that you stay in
custody, though, until I've made my decision at the

earliest, so you'll continue to be remanded into
custody at this time.

All right.  Mr. Trimble, anything further at
this time?

MR. TRIMBLE:  Not on behalf of the United
States.

THE COURT:  Okay.  Thank you.  Mr. Rossman,
anything further?

MR. ROSSMAN:  Nothing further, Your Honor.

THE COURT:  Okay.  Thank you all.  We'll
stand adjourned for the day.

[END OF PROCEEDINGS - 6:14:26 p.m.]

* * * * *

I,  Sandra L. Wilder, do hereby certify that
the foregoing is a true, correct and complete
transcript of the digitally-recorded proceedings in
this matter, recorded on June 28, 2016, and
transcribed from the digital recording, to the best of
my ability to hear said recording, and that said
transcript has been compared with the digital
recording.


/s/ Sandra L. Wilder

SANDRA L. WILDER, RMR, CRR,

COURT REPORTER          Date:  07/08/2016